# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

SPIN MASTER, LTD.,

       Plaintiff,

       - against -

E. MISHAN & SONS, INC.,              No. 19-CV-09035 (DLC)

       Defendant.

-----------------------------------------------------X

E. MISHAN & SONS, INC.,

       Counterclaim Plaintiff,

       -against-

SPIN MASTER, LTD.; *et al.*

       Counterclaim Defendants.

-----------------------------------------------------X

## <u>PLAINTIFF'S PRE-TRIAL MEMORANDUM OF LAW</u>

Kevin N. Ainsworth
MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.
Chrysler Center
666 Third Avenue
New York, New York 10017
Tel: (212) 935-3000
Fax: (212) 983-3115
kainsworth@mintz.com

Andrew D. Skale
(Pro Hac Vice application filed)
MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Tel: (858) 314-1500
Fax: (858) 314-1501
adskale@mintz.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .......................................................................................................2

    A.    Spin Master Created the Market for Wall-Racing Toy Vehicles ............................2

    B.    EMSON Introduced its Infringing Products at Lower Prices, Decreasing
           Spin Master's Market Share and Creating Price Erosion in the Market .................4

    C.    EMSON's Infringement is Willful and Ongoing ....................................................5

ARGUMENT .........................................................................................................................6

I.     This Court Has Subject Matter Jurisdiction and Spin Master Has Standing to
      Bring This Action ..........................................................................................................7

II.    Spin Master Is Likely To Succeed On Its Patent Infringement Claims .............................8

    A.    EMSON Infringes At Least Claims 1, 21, and 23 of the '897 Patent .....................8

    B.    EMSON Has Not and Cannot Meet Its Burden to Demonstrate Patent
           Invalidity ...............................................................................................................8

           1.    EMSON's Burden to Prove Invalidity .......................................................9

           2.    EMSON Failed to Prove the '897 Patent is Anticipated ...........................10

           3.    EMSON Failed to Prove the '897 Patent is Rendered Obvious ................11

III.   Spin Master Will Suffer Irreparable Harm Without an Injunction ...................................16

IV.   The Balance of Hardships Weighs Decidedly in Spin Master's Favor .............................20

V.    Enjoining Patent Infringement Advances the Public Interest ...........................................22

VI.   Alternatively, There are Serious Questions Going to the Merits, and the Balance
      of Hardships Tips Strongly in Spin Master's Favor, Also Justifying an Injunction ..........23

CONCLUSION .....................................................................................................................23

# TABLE OF AUTHORITIES

**Cases**             **Page(s)**

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008) .................................................................6, 11

*Acumed LLC v. Stryker Corp.*,
    551 F.3d 1323 (Fed. Cir. 2008) ................................................................19, 21

*Alfred E. Mann Foundation for Scientific Research* v. *Cochlear Corp.*,
    604 F.3d 1354 (Fed. Cir. 2010) ........................................................................7

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
    725 F.2d 1350 (Fed. Cir. 1984) ........................................................................9

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
    839 F.3d 1034 (Fed. Cir. 2016) ......................................................................15

*Blumenthal Distrib. v. Exec. Chair, Inc.*,
    2010 U.S. Dist. LEXIS 142193 (E.D.N.Y. Nov. 9, 2010) ..................................18

*Broadcom Corp. v. Emulex Corp.*,
    732 F.3d 1325 (Fed. Cir. 2013) ................................................................17, 18

*Celsis in Vitro, Inc. v. Cellzdirect, Inc.*,
    664 F.3d 922 (Fed. Cir. 2012) ..................................................................19, 22

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010) .........................................................................6, 23

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
    717 F.3d 1336 (Fed. Cir. 2013) ......................................................................18

*Eurand, Inc. v. Mylan Pharmaceuticals, Inc.*,
    676 F.3d 1063 (Fed. Cir. 2012) ................................................................12, 13

*Genentech, Inc. v. Novo Nordisk A/S*,
    935 F. Supp. 260 (S.D.N.Y. 1996) ..................................................................19

*Glaxo Grp. Ltd. v. Apotex, Inc.*,
    64 Fed. App'x 751 (Fed. Cir. Apr. 22, 2003) ...................................................20

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) ..........................................................................................11

*Hybritech Inc. v. Abbott Labs.*,
    849 F.2d 1446 (Fed. Cir. 1988) ......................................................................22

*In re Nuvasive, Inc.*,
  842 F.3d 1376(Fed. Cir. 2016)........................................................................14

*Intervet America, Inc. v. Kee-Vet Labs., Inc.*,
  887 F.2d 1050 (Fed. Cir. 1989)......................................................................10

*Jacobson v. Cox Paving Co.*,
  1991 U.S. Dist. LEXIS 17787 (D. Ariz. May 20, 1991) .......................................21

*Kearns v. Chrysler Corp.*,
  32 F.3d 1541 (Fed. Cir. 1994).......................................................................18

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*,
  660 F.3d 1293 (Fed. Cir. 2011).......................................................................9

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
  688 F.3d 1342 (Fed. Cir. 2012)..................................................................11, 14

*KSR International Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)...................................................................................12

*Kustom Signals, Inc. v. Applied Concepts, Inc.*,
  264 F.3d 1326 (Fed. Cir. 2001).......................................................................8

*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*,
  925 F.3d 1225 (Fed. Cir. 2019).......................................................................7

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
  244 F.3d 1365 .........................................................................................9

*Mintz v. Dietz Watson, Inc.*,
  679 F.3d 1372 (Fed. Cir. 2012)......................................................................14

*PersonalWeb Technologies, LLC v. Apple, Inc.*,
  848 F.3d 987 (Fed. Cir. 2017).......................................................................12

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
  429 F.3d 1364 (Fed. Cir. 2005)..............................................................8, 19, 20

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
  702 F.3d 1351 (Fed. Cir. 2012)......................................................................18

*Read Corp. v. Viper Int'l*,
  1996 U.S. App. LEXIS 3847 (Fed. Cir. Feb. 23, 1996) .......................................22

*Richardson-Vicks v. Upjohn Co.*,
  122 F.3d 1476 (Fed. Cir. 1997)......................................................................11

*Robert Bosch LLC v. Pylon Manufacturing Corp.*,
659 F.3d. 1142 (Fed. Cir. 2011)..........................................................................19

*Sanofi-Synthelabo v. Apotex, Inc.*,
470 F.3d 1368 (Fed. Cir. 2006)...........................................................................10

*Shire, LLC v. Amneal Pharms., LLC*,
802 F.3d 1301 (Fed. Cir. 2015)...........................................................................10

*Smith Int'l, Inc. v. Hughes Tool Co.*,
718 F.3d 1573 (Fed. Cir. 1983)...........................................................................22

*TEK Global, S.R.L.* v. *Sealant Systems International*,
920 F.3d 777 (Fed. Cir. 2019)........................................................................17, 19

*Teledyne Indus., Inc. v. Windmere Prods, Inc.*,
433 F. Supp. 710 (S.D. Fla. 1977) ......................................................................21

*Time Warner Cable, Inc. v. DirecTV, Inc.*,
497 F.3d 144 (2d Cir. 2007)............................................................................6, 23

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
748 F.3d 1159 (Fed. Cir. 2014)..............................................................20, 21, 22

*Verdegaal Bros. v. Union Oil Co. of California*,
814 F.2d 628 (Fed. Cir. 1987)..............................................................................10

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008).................................................................................................6

**Statutes**

28 U.S.C. § 1331...............................................................................................7

28 U.S.C. § 1338...............................................................................................7

35 U.S.C. § 102..........................................................................................10, 11

35 U.S.C. § 103.................................................................................................11

35 U.S.C. § 154...................................................................................................6

35 U.S.C. § 271...................................................................................................7

35 U.S.C. § 282...................................................................................................9

35 U.S.C. § 283.................................................................................................17

<u>**PRELIMINARY STATEMENT**</u>

EMSON is illicitly riding the coattails of Spin Master's success by selling a cheap, knock-off toy vehicle imported from China, which infringes patents for which Spin Master holds an exclusive license. That infringement should be enjoined.

For more than a decade, Spin Master has been marketing and selling a popular motorized remote-control, toy vehicle with the ability to climb walls and drive on ceilings, seemingly defying gravity. That pioneering and unique feature derives from patented technology that draws air through a duct between the car and a surface (wall, ceiling, or other surface), which induces a pressure differential forcing the car against the surface. Spin Master introduced the technology more than a decade ago with its Zero Gravity® toys and created a market, through advertising, development, and sales efforts, for cars that climb walls. Due to its success, many cheap knock-off products have entered the market, and Spin Master has had to actively police the market to remove infringers. EMSON is just another such company looking to capitalize on the popularity of Spin Master's Zero Gravity® toys.

The Complaint asserts infringement of four patents covering the wall-racer technology (collectively the "Wall Racer Patents"),[1] but this motion for preliminary injunction focuses on only U.S. Patent Number 9,675,897 (the "'897 Patent"), entitled "Wall Racer Toy Vehicles."

Spin Master is being irreparably harmed by EMSON's infringing products, which are being sold nationally in the same channels that carry Spin Master's Zero Gravity® products, including Amazon.com, Target, Walmart, and other retailers. (*See* PX-16 at SM_0000135-136; PX-17; PX-

---

[1] "Wall Racer Patents" includes the '897 Patent, as well as U.S. Patent Number 7,890,916 (the "'916 Patent" (PX-4)), issued on July 19, 2011; U.S. Patent Number 7,753,755 (the "'755 Patent" (PX-5)), issued on July 13, 2010; and U.S. Patent Number 8,979,609 (the "'609 Patent" (PX-6)), issued on March 17, 2015. All four patents claim priority from a single provisional application filed December 30, 2004.

18; PX-19; Answer ¶¶ 10, 25, 40, 55.) As the Infringing Products flood the market, they are substantially undercutting Spin Master's market share for vehicles that climb walls. (Keller Decl. ¶¶ 10-22.) The value of the advertising dollars that Spin Master spends is being diluted by the presence of knock-off, infringing products. (*Id.*; *see also id.* ¶¶ 6, 14.) Moreover, EMSON did not have to pay the development costs, cost to create the market, royalty cost to the inventors/patent owners, or cost to bring the product to market – EMSON simply stole Spin Master's patented invention and rode Spin Master's coattails.

Unfair competition from EMSON and its undercutting of prices is jeopardizing Spin Master's rights to which it is entitled under the Patent Laws of the United States. Due to the high likelihood of success on Spin Master's claims for patent infringement, EMSON should be preliminarily enjoined from importing, making, using, selling, and offering for sale the Infringing Products.

## **STATEMENT OF FACTS**

### A.    **Spin Master Created the Market for Wall-Racing Toy Vehicles**

In August 2004, Spin Master acquired an exclusive license to patented technology that enables toy vehicles to visibly defy the laws of physics—to climb walls and ceilings with ease— to the endless delight of enthusiasts. (PX-1 (the "License" and the "Licensed Technology").)[2]

Spin Master introduced the Licensed Technology to the market in 2005 as the "Air Hogs RC" brand "Zero Gravity" R/C Wall Racer®. That toy was a relatively heavy and large (12 inches long by 7½ inches wide by 5¼ wide) "hummer" style truck (the "Hummer"). Pictures of the

---

[2]    All exhibits to this Memorandum of Law are Plaintiff's exhibits ("PX") for the December 4, 2019 preliminary injunction hearing, which were provided to the Court pursuant to the Court's November 1, 2019 Order. The November 22, 2019 Declaration of Mary Katherine Keller ("Keller Decl.") and the November 22, 2019 Declaration of Christopher Harrs ("Harrs Decl.") were also provided to opposing counsel and the Court pursuant to that Order.

Hummer are shown in PX-8. (Harrs Decl. ¶6.) The Hummer was an immediate success. In 2005, it was featured in print media including in Popular Science, U.S. News & World Report, The Washington Post, and the New York Times. (PX-11.) The Hummer was presented as a top Christmas gift pick and appeared on many Christmas segments of popular news and variety shows such as the Late Show with David Letterman. (Harrs Decl. ¶7.)

Since 2005, Spin Master has sold in the U.S. several variants of its Zero Gravity® products. (Harrs Decl. ¶8.) Spin Master spent years in research and development efforts to refine the technology and components to make the Zero Gravity® toys small, agile, and lightweight so that it can drive on ceilings and walls. (*Id.* ¶9.) Spin Master worked to lower production costs so the product could be sold at prices that make it appealable and affordable to consumers as a toy. (*Id.*) Over time, Spin Master has refined the size and technology to make its toy vehicle lighter weight so that it is more maneuverable on walls and ceilings and requires smaller, lighter, and less expensive batteries. (*Id.*) The newer Zero Gravity® products are less expensive to manufacture and are marketed to a broader audience, at lower prices, than the early products. (*Id.*)

In the September 2008 issue of Popular Science, Spin Master's Air Hogs Zero Gravity® Mini was featured as the "PopSci Pick of the Month." (*Id.* ¶10.) And in December 2008, Good Housekeeping named the Zero Gravity® Micro in its Best Toy Awards. *Id.* In 2009, the Zero Gravity® Micro was named Toy of the Year Most Innovative Toy. (*Id.* ¶11.)

Since 2008, Spin Master has sold more than 4.8 million Zero Gravity® vehicles worldwide, and more than 3.8 million Zero Gravity® vehicles in the United States. (Keller Decl. ¶5.) Spin Master spent years marketing and advertising its Zero Gravity® toy vehicles, spending more than $6.5 million on media (online and television), plus considerable time and money in public relations outreach to generate media attention regarding the Zero Gravity® brand. (*Id.* ¶6.) These

investments were made with the understanding that Spin Master had the exclusive rights to the Licensed Technology. (*Id.*)

Most recently, in August 2019, Spin Master re-launched its promotional marketing campaign for its Zero Gravity® Laser, which allows the user to control the vehicle by shining a light beam, which the vehicle chases. (*Id.* ¶7.) Spin Master spent, or is planning to spend, a significant sum, approximately $860,000, in a media spend (online and television) for September through December 2019, advertising the Zero Gravity® product line in order to maximize sales of the product. (*Id.*)

The popularity of the Zero Gravity® toys has led to an influx of knock-offs from China, many of which infringe Spin Master's trademarks and patent rights. (*Id.* ¶¶9-10; Harrs Decl. ¶¶13-19.) Spin Master has aggressively pursued infringers, by filing complaints with online retailers, by sending cease and desist letters, and when necessary by filing lawsuits. (Harrs Decl. ¶¶13-25.)

**B.  EMSON Introduced its Infringing Products at Lower Prices, Decreasing Spin Master's Market Share and Creating Price Erosion in the Market**

In August 2019, Spin Master learned that EMSON had begun selling the Infringing Products, which are made in China and imported into the U.S., and which infringe the Wall Racer Patents and compete with the Zero Gravity® products. (Harrs Decl. ¶21; Keller Decl. ¶10; Answer ¶¶ 13, 28, 43, 58.) The Infringing Products are sold in the same sales channels as Spin Master's Zero Gravity® toys—*i.e.*, Amazon.com, Target and Walmart stores and websites—and sold via EMSON's own web page. (Keller Decl. ¶¶10-13; PX-16 at SM_0000135-136; PX-17; PX-18; PX-19; PX-21.)

Spin Master priced the Zero Gravity® Laser vehicle at $34.99 and projected sales of 260,000 toys at that price point through the end of 2019. (Keller Decl. ¶13.) However, EMSON sells their Infringing Products at a low price point of $19.99 or less. (*Id.*; PX-17; PX-18; PX-19;

PX-20.) And Spin Master had to lower the price of its Zero Gravity® vehicle to $29.99 to compete. (Keller Decl. ¶13.) Thus, although Spin Master is the exclusive licensee of this patented technology, the presence of the Infringing Products has decreased Spin Master's market share and pricing.

EMSON, on the other hand, has benefited, and is benefitting, substantially from Spin Master's advertising and marketing efforts to create and increase a market for cars that climb walls. (Keller Decl. ¶¶14, 16.) EMSON can sell its infringing toys at a lower retail price because EMSON unfairly benefits from costs that Spin Master alone bears as the exclusive licensee of the Licensed Technology. *Id.* Specifically, Spin Master pays royalties to the Licensors – whose technology all of infringing products use but do not pay for. (*Id.* ¶14.) EMSON unfairly benefits from Spin Master's investments in developing and utilizing the innovative Zero Gravity® technology. *Id.* And they benefit from Spin Master's advertising efforts, which created interest in and a market for the wall-racing toys. (*Id.* ¶¶14, 16.)

## C.    EMSON's Infringement is Willful and Ongoing

Spin Master gave express notice to EMSON on August 26, 2019 that it is infringing Spin Master's Licensed Patents. (PX-23; Answer ¶ 17.) EMSON refused to remove its product from the market, so Spin Master sued for infringement. *Id.* After filing suit, Spin Master learned (on or about October 9, 2019) that Target stores apparently had begun selling EMSON's Infringing Products in stores and online. (Keller Decl. ¶11; PX-16 at SM_0000135-136.) Weeks later, Spin Master learned that EMSON had recently begun selling the Infringing Products through Walmart stores and on Walmart's website. (Keller Decl. ¶12.) Accordingly, Spin Master filed this motion for preliminary injunction.

## ARGUMENT

A patent grants the patent owner (including its exclusive licensee) the right to exclude others from making, using, or selling the claimed invention for the term of the patent. 35 U.S.C. § 154. A preliminary injunction may be granted to protect that exclusive right, and "the standard for granting or denying a motion for preliminary injunction is not unique to patent law." *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1367 (Fed. Cir. 2008). Instead, "the standard of the regional circuit should apply." *Id.*

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Time Warner Cable, Inc. v. DirecTV, Inc.*, 497 F.3d 144, 152-153 (2d Cir. 2007). Alternatively, a court may also issue a preliminary injunction if the moving party demonstrates "'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). A defendant cannot defeat a preliminary injunction merely by raising "substantial questions." *See Abbott Labs*, 544 F.3d at 1368-1369.

As demonstrated below, Spin Master easily establishes each of the required elements and is entitled to preliminary injunctive relief to prevent the irreparable harm EMSON is causing.

## I. This Court Has Subject Matter Jurisdiction and Spin Master Has Standing to Bring This Action

This Court has subject matter jurisdiction over this action because Plaintiff's claims for infringement of the Licensed Patents arise under the Patent Laws of the United States, 35 U.S.C. §271 et seq. Subject matter jurisdiction is therefore proper under 28 U.S.C. §§1331 and 1338(a).

EMSON has asserted as an affirmative defense that Spin Master lacks standing to bring this action. (Answer ¶ 66.) To the extent that EMSON continues to assert this defense, this is demonstrably incorrect. First, Spin Master is undisputedly the sole and exclusive licensee of the Wall Racer technology. (PX-1, ¶ 1.1 (conveying "the sole and exclusive right and license"); Harrs Decl.). Second, per the parties' November 8, 2019 amendment, Spin Master has the sole and unequivocal right to decide whether to pursue a lawsuit and the inventor-licensors have retained no such right. (PX-2.) Third, despite EMSON's suggestions otherwise, all parties to the License Agreement recently reaffirmed that the License Agreement remains in full "force and effect" (*Id.*; Harrs Decl. ¶2). Where, as here, the exclusive licensee currently holds "all substantial rights" related to the patent, including the right to sue, it has the sole standing to sue those for infringement of the patents' claims. *See, e.g., Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225 (Fed. Cir. 2019) (vacating dismissal); *Alfred E. Mann Foundation for Scientific Research* v. *Cochlear Corp.*, 604 F.3d 1354, 1359 (Fed. Cir. 2010). Accordingly, Spin Master, as exclusive licensee, has standing to bring this action in its own name for infringement of the Licensed Patents.[3]

---

[3] Even if the inventor-licensors were needed as a party, that does not destroy standing but is merely an issue of adding a necessary party. *Lone Star*, 925 F.3d at 1238-39 (reversing dismissal for lack of standing by an exclusive licensee that had failed to join the licensor, instructing the district court to give the exclusive licensee an opportunity to join the licensor under Rule 19).

## II. Spin Master Is Likely To Succeed On Its Patent Infringement Claims

### A. EMSON Infringes At Least Claims 1, 21, and 23 of the '897 Patent

The Infringing Products infringe at least Claims 1, 21, and 23 of the '897 Patent because they contain every element of each of those claims. *See Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1333 (Fed. Cir. 2001). "Determining the likelihood of infringement requires two steps, first claim construction and second a comparison of the properly construed claims to the accused product." *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1372 (Fed. Cir. 2005). As extensively detailed in Plaintiff's motion and its claim chart, a clear and concise case for infringement was laid out. (ECF No. 18 at 9-16; ECF No. 17-3 (Claim Chart, also available at PX-DEMO-1).)

### B. EMSON Has Not and Cannot Meet Its Burden to Demonstrate Patent Invalidity

It appears EMSON plans on arguing that the pioneering '897 Patent is invalid (Answer, ¶¶ 69-70). However, EMSON has failed to articulate any basis, analysis, or claim charts in support of that assertion.

EMSON's counsel has refused to even articulate the grounds on which it alleges invalidity, despite this Court's direction on November 1, 2019, that EMSON must identify by November 12 its allegedly invalidating prior art. (Ct. Conf. of 11/1/2019 Tr. at 11.) Instead of complying with that order, EMSON dumped 400 alleged prior art references on Spin Master on November 12. The Court addressed that behavior at a conference on November 19, and directed EMSON to identify the "the five principal pieces of prior art on which you intend to place the greatest emphasis for the preliminary injunction hearing." (Ct. Conf. of 11/19/2019 Tr. at 8.) Thereafter, EMSON listed 5 documents without any explanation. (PX-45.) EMSON had every opportunity to provide an invalidity chart – or even just a short explanation – as to how it believed the references invalidated

the claims, but it has refused to do so. What is clear is that despite EMSON's counsel's representation to the Court on November 1, 2019 that EMSON had "a very good position on invalidity in terms of prior art that was not cited by the patent office during prosecution" (Ct. Conf. 11/1/19 Tr. at 6) no such evidence has been produced.

Given EMSON's adamant refusal to describe any basis for its alleged invalidity defense, Spin Master is left to guess what argument(s) it will assert to try to invalidate the '897 Patent.

### 1. EMSON's Burden to Prove Invalidity

Regardless of whether EMSON argues invalidity based on either anticipation or obviousness, it cannot meet its high burden. As an initial matter, "[a] patent shall be presumed valid . . . . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282; *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, 660 F.3d 1293, 1302 (Fed. Cir. 2011). To find the patent invalid, the "Defendant[] bear[s] the burden of showing facts supported by ***clear and convincing evidence*** to prove the patent invalid." *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365. 1375 (Fed. Cir. 2001) (emphasis added). As Judge Rich, one of the authors of the 1952 Patent Act explained, there is a "basic proposition that a government agency such as the [USPTO] was presumed to do its job." *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984).

Here, the patent application leading to the '897 Patent was rigorously examined by the USPTO over a 2-year period by U.S. Primary Patent Examiner Tramar Harper, who had twelve

years of experience at the time of issuance of the '897 Patent.[4]  Mr. Harper was supervised by Supervisory Examiner Hang Hu, who has comparable experience.[5]

During his prosecution, the USPTO reviewed many of the references cited by Defendant, yet finding the claims of the '897 Patent to be valid over all these references.  When a reference is listed on the face of a patent, "the examiner is presumed to have considered it."  *Shire, LLC v. Amneal Pharms., LLC,* 802 F.3d 1301, 1307 (Fed. Cir. 2015).  Defendants therefore "ha[ve] the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents." *Id.* (*citing PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008); *see also Intervet America, Inc. v. Kee-Vet Labs., Inc*., 887 F.2d 1050, 1054 (Fed. Cir. 1989) ("presumption that the [patent e]xaminer did his duty and knew what claims he was allowing.").

## 2.    EMSON Failed to Prove the '897 Patent is Anticipated

First turning to anticipation, it is relatively easy to see that none of the references anticipate any of the claims of the '897 Patent.  Under 35 U.S.C. § 102, "[a] claim is anticipated **_only_** if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference."  *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631, 2 USPQ2d 1051, 1053 (Fed. Cir. 1987) (emphasis added); *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1375 (Fed. Cir. 2006) (affirming grant of preliminary injunction where prior art did not disclose pharmaceutical compound's active ingredient).

---

[4]    https://www.patentbots.com/stats/examiner/3717-HARPER-TRAMAR-YONG

[5]    https://www.patentbots.com/stats/examiner/3717-HU-KANG

In the alleged "prior art" provided by EMSON, there is not a single document that meets this criteria, and EMSON points to none. As no *single* reference includes each and every element of the alleged claims, none of the references cited by EMSON can render the claims anticipated under 35 U.S.C. § 102. Thus, EMSON has not met its burden to come forward with a single prior art reference that shows with clear and convincing evidence that any claim of the '897 Patent has been anticipated.

### 3. EMSON Failed to Prove the '897 Patent is Rendered Obvious

To prove a patent claim invalid under the obviousness test, EMSON also bears the heavy burden of proving it arguments with clear and convincing evidence. EMSON has to show that "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious" to a person having ordinary skill in the art at the time of the invention. 35 U.S.C. § 103. Critically, "each and every claim limitation [must] be found present in the combination of the prior art references before the analysis proceeds." *Abbot Labs v. Sandoz, Inc.*, 544 F.3d at 1351.

Obviousness is a question of law that is predicated on several factual inquiries. *See Richardson-Vicks v. Upjohn Co*., 122 F.3d 1476, 1479 (Fed. Cir. 1997). Specifically, there are four considerations: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter and the prior art; and (4) secondary considerations of non-obviousness, such as long-felt but unsolved need, failure of others, praise by others in the industry, and unexpected results. *See Graham v. John Deere Co*., 383 U.S. 1, 17-18 (1966). Thus, a party challenging the validity of a patent based on obviousness must demonstrate by clear and convincing evidence that the invention described in the patent would have been obvious to a person of ordinary skill in the art at the time the invention was made. *Id; Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012).

When alleging a patent claim has been rendered obvious, "a patent claim cannot be proved obvious merely by showing that the combination of elements was 'obvious to try." *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). The Supreme Court has also cautioned "the risk of courts and patent examiners falling prey to hindsight bias". *Id.* That is, "decision-makers [cannot] unconsciously let knowledge of the invention bias their conclusion concerning whether the invention was obvious in the first instance … In other words, knowing that the inventor succeeded in making the patented invention, a fact finder might develop a hunch that the claimed invention was obvious, and then construct a selective version of the facts that confirms that hunch." *Eurand, Inc. v. Mylan Pharmaceuticals, Inc.*, 676 F.3d 1063, 1079 (Fed. Cir. 2012) (internal citations omitted) (vacating the district court's invalidity judgment and retaining preliminary injunction).

On top of the above burdens, EMSON cannot simply pick out two references and argue to combine them to arrive at the claimed invention. *PersonalWeb Technologies, LLC v. Apple, Inc.*, 848 F.3d 987, 993–94 (Fed. Cir. 2017) (reversing a Patent Trial and Appeal Board ("PTAB") finding of invalidity). The Federal Circuit held that it is important to clearly articulate both (a) who is a person having ordinary skill in the art; and (b) why that person would have been motivated to combine the applied references, recognizing that "because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *Id.* Thus, proving a claim is invalid for being obvious, is a difficult task.

Here, EMSON has done no such analysis. EMSON has:

(a) ***not*** identified any combination of references (instead leaving Spin Master to guess as to which of the myriad combinations EMSON will assert);[6]

(b) ***not*** identified who would be a person of ordinary skill in the art, let alone some justification for why such a person would be of ordinary skill in the art; and

(c) ***not*** identified any motivation to combine any of the references.

First, EMSON has pointed to no combination of prior art references that would demonstrate obviousness. In fact, the references cited by EMSON are essentially no different than those references already reviewed by the USPTO, for which the '897 Patent was found to be valid over. *See, e.g.,* U.S. Patent No. 3,246,711 ("Snoeyenbos," cited by the USPTO during prosecution) (available at PX-28.)

Second, EMSON has failed to demonstrate who is a person of ordinary skill in the art. To even identify such a person, EMSON needs ***clear and convincing evidence*** justifying the identity of such a person. *Eurand, Inc. v. Mylan Pharmaceuticals, Inc.*, 676 F.3d 1063, 1068-69 (Fed. Cir. 2012) ("Generally, a party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled artisan would had reason to combine the teaching of the prior art references… and that the skilled artisan would have had a reasonable expectation of success from doing so.") (Internal quotes omitted). EMSON has identified no ***evidence*** as to who is a person having ordinary skill in the art ("PHOSITA").[7]

Third, to prove there is a motivation to combine, EMSON (1) cannot use "conclusory statements alone," but must "articulate a reason why a PHOSITA would combine the prior art

---

[6] Defendant identified a number of foreign references, however, Defendant failed to include any certified translations of such references.

[7] In its interrogatories, EMSON represented that it would "serve expert reports as provided by the scheduling order yet to be entered in this case," which has not yet occurred. The only experts identified by Defendant were economic experts James Donohue and Marie Manasi.

references;" (2) must have an adequate evidentiary basis for that finding; and (3) must provide a "satisfactory explanation" for the motivation finding that includes an express and "rational" connection with the evidence presented. *In re Nuvasive, Inc.*, 842 F.3d 1376, 1382-83(Fed. Cir. 2016) (reversing a PTAB finding of invalidity) (*citing In re Lee*, 277 F.3d 1338, 1343 (Fed. Cir. 2002) (conclusory statements are insufficient); *Cutsforth, Inc. v. MotivePower, Inc.*, 636 F. App'x 575, 578 (Fed. Cir. 2016) (must positively explain motivation – not just reject arguments against motivation); and *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1362 (Fed. Cir. 2016) (Defendant "cannot rely solely on common knowledge or common sense to support its findings" of motivation)). EMSON has done none of the above.

Finally, EMSON has not addressed any of the secondary considerations of nonobviousness. These objective indicia include: "commercial success, long-felt need, copying, unexpected and superior results, wide spread acceptance in the field, and initial skepticism." *Kinetic Concepts, Inc. v. Smith Nephew, Inc.*, 688 F.3d 1342, 1370 (2012) (reversing Court's issuing of judgment as a matter of law that plaintiff's claims were obvious because the jury had found that "nearly every objective indicia of nonoviousness [sic] was established."). "Praise from others" can also be considered a factor. *Mintz v. Dietz Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012) (affirming non-infringement but vacating and remanding as to invalidity due to the district court's failure to perform a proper analysis of objective indicia of non-obviousness). These factors are taken into account because "they 'provide objective evidence of how the patented device is viewed in the marketplace, by those directly interested in the product.'" *Kinetic*, 688 F.3d at 1370 (*citing Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988)). The Court frequently emphasizes that "these objective criteria help inoculate the obviousness analysis against hindsight." *Mintz*, 679 F.3d at 1378.

Here, Spin Master's Zero Gravity® toy vehicles have been widely successful and universally praised by industry experts. When the Zero Gravity® toy was first introduced by Spin Master, it was hailed by U.S. News & World Report as achieving "a feat **_no_** remote control car has ever accomplished." (PX-11, p.1 (emphasis added).) News agencies gasped "[w]e didn't believe it either until we saw it for ourselves." (*Id.*, p.2 (Washington Post).) Good Housekeeping quoted kids and parents as stating "How'd it do that?" (PX-10, p.2.) The toy went on to win numerous awards and accolades, including "Most Innovative Toy," resulting in more than 4.8 million units sold. (Harrs Decl. ¶¶10-11; Keller Decl. ¶¶5,8.) These awards included a Best Toy Award from Good Housekeeping in 2008; the 2008 Popular Science "PopSci Pick of the Month"; the People's Play Award in the Radio Control category by TTPM (Toys, Tots, Pets & More) in 2009; Amazon's Top Toys and Walmart's Chosen by Kids award in 2014; the National Parenting Center's Seal of Approval in 2014; a Best Toy at Toy Fair in 2019 by Popular Mechanics. (Keller Decl. ¶8, Harrs Decl. ¶11.) Every secondary indicia of nonobviousness shows that this patented invention was not obvious as of the priority date, December 30, 2004.

The burden for obviousness is high, and EMSON has not and cannot meet it. *See Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034, 1047-1048 (Fed. Cir. 2016) (finding that defendant failed to establish the obviousness of plaintiff's patent even where the two pieces of prior art identified met all of the elements of the claim at issue).[8]

---

[8] Defendant has also asserted a lack of markings as an affirmative defense (Answer, ¶71). This, too, has no relevance to the issue of injunctive relief. First, the patents were listed on Spin Master's website during the relevant sales period. Second, Defendant admitted that it was on notice of the '897 Patent as of August 26, 2019, and it has continued to sell many units after that date. Third, and more importantly, whether or not the products at issue were marked with the '897 Patent does not speak to the likelihood of success on the merits or the irreparable harm suffered by Spin Master. It speaks only to the calculation of damages, and is irrelevant to the issues before the Court here.

### III.     Spin Master Will Suffer Irreparable Harm Without an Injunction

EMSON's sales of the Infringing Products has and will continue to cause irreparable harm to Spin Master if not enjoined. The Infringing Products compete directly with Spin Master's patented Zero Gravity® toy cars. EMSON is piggy-backing on the success and efforts of Spin Master, and is importing and selling its competing line of Infringing Products in the United States, in the same channels where Spin Master sells its products, and at lower price points. EMSON's Infringing Products infringe the very feature that makes Spin Master's products unique and that drives demand for such toy vehicles. Indeed, Spin Master has already begun to feel the effects of EMSON's infringement—losing sales, decreasing market share and eroding the price of Zero Gravity® vehicles.  Irreparable harm is readily apparent.

EMSON is cannibalizing Spin Master's sales and causing harm to Spin Master.  EMSON's Radical Racers directly compete with Spin Master's Zero Gravity® products in many of the same retailers as Spin Master. (Keller Decl. ¶¶10-13.) On Amazon.com, for example, the competition is clearly evident—when a consumer searches Amazon.com for "Zero Gravity Racer," EMSON's Radical Racer products show up in the search results.  (Keller Decl. ¶16.) EMSON's sales data shows that it is selling Radical Racers in numerous retailers where Spin Master sells its Zero Gravity® products:   Target, Walmart, Amazon.com, Fred Meyer, and Meijer. (PX-32 at EMS009350, 9376, 9348, 9356, 9357; PX-33.)

In 2019, EMSON imported more than 900,000 units. (PX-30.) EMSON's sales data shows significant sales through November 19, 2019 in the United States:

| Retailer | Gross Units Sold | Gross Sales |
|---|---|---|
| Direct to Consumer (PX-34 at EMS012007) | 2,378 | $47,798.45 |
| Amazon.com (PX-33) | 10,098 | $221,714.13 |
| Other Retailers (PX-35 at EMS0012009, 12010, and 12011) | 607,502 | $6,950,046.44 |
| **TOTAL** | **619,978** | **$7,219,559.02** |

EMSON's sales projections (produced by EMSON on or about November 12, 2019) show that it plans to sell more than 339,000 individual and multi-pack units of Radical Racers in the United States through the end of 2019 into the first half of 2020. (PX-40.) As of November 20, 2019, it currently has over 250,000 units in inventory. (PX-43.) The presence of Radical Racers competing in the same retail locations as Spin Master's Zero Gravity® has and will continue to negatively impact Spin Master's pricing and sales volume. (Keller Decl. ¶¶13, 18-22.)

Worse, EMSON's Radical Racers are sold for a retail price of approximately $19.99 per toy, which is a substantially lower price than Spin Master sells its Zero Gravity® Laser products. (Keller Decl. ¶13; PX-17; PX-18; PX-19; PX-20.) Spin Master introduced its Zero Gravity® Laser products this year at a retail price of $34.99, but has been forced to cut that price to $29.99 to compete. (Keller Decl. ¶13.)

Protection against such unlawful direct competition is precisely what patent law grants. *See, e.g.*, *TEK Global, S.R.L.*, 920 F.3d at 792 (Fed. Cir. 2019) (affirming finding of irreparable harm where the patented feature drives consumer demand, the licensee and infringer were in direct competition, and the licensee suffered a lost market share); *Broadcom*, 732 F.3d at 1337 (affirming grant of permanent injunction and upholding finding of irreparable harm where parties were "direct competitors in a limited market" for a product where "the patented feature … drive[s] the demand for the product"). U.S. patent law expressly provides for the grant of injunctions to prevent

infringement, "in accordance with the principles of equity." 35 U.S.C. § 283. "In view of the fact that the principal right afforded by a patent is the 'right to exclude,' … 'the nature of the patent grant … weighs against holding that monetary damages will always suffice to make the patentee whole.'" *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1549-1550 (Fed. Cir. 1994) (quoting *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 387-88 (Fed. Cir. 1987) (second alteration in original)). "Indeed, 'while monetary relief is often the sole remedy for past infringement, it does not follow that a monetary award is also the sole remedy against *future* infringement." *Kearns*, 32 F.3d at 1550 (quoting *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1233 (Fed. Cir. 1985)). That is why "[t]he courts have a long history of remedying trespass on property rights—including patent rights—by removing the trespasser." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1338 (Fed. Cir. 2013). The court's equity analysis "proceeds with an eye to the 'long tradition of equity practice' granting 'injunctive relief upon a finding of infringement in the vast majority of patent cases.'" *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1362 (Fed. Cir. 2012) (citation omitted); *Blumenthal Distrib. v. Exec. Chair, Inc.*, 2010 U.S. Dist. LEXIS 142193, at *34 (E.D.N.Y. Nov. 9, 2010) ("'given the difficulty of protecting a right to *exclude* through monetary remedies'… most courts have granted injunctions upon a finding of infringement") (emphasis in original) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395 (2006) (Roberts, J., concurring)).

"Patent property rights are especially difficult to protect with solely monetary relief …." *Broadcom*, 732 F.3d at 1338 (citing *Presidio,* 702 F.3d at 1362-1363). Specifically, "[w]here two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed.

Cir. 2013). Moreover, "[i]rreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction," *id.* at 1344, as well as "decreases in market share" and "[d]ecreases in revenue which cause decreases in research and development funding or lost business opportunities…." *Genentech, Inc. v. Novo Nordisk A/S*, 935 F. Supp. 260, 282 (S.D.N.Y. 1996), rev'd on other grounds, 181 F.3d 1361, 1368 (Fed. Cir. 1997); *see Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008) ("infringement may cause a patentee irreparable harm not remediable by a reasonable royalty"); *Celsis in Vitro, Inc. v. Cellzdirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."). Furthermore, "the inherent difficulty of quantifying 'loss of market share, brand recognition, and customer goodwill' and of estimating monetary damages indicates that 'remedies at law are inadequate.'" *TEK Global, S.R.L.* v. *Sealant Systems Int'l*, 920 F.3d 777, 792 (Fed. Cir. 2019) (quoting *i4i Ltd. P'ship* v. *Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010)).

Spin Master will continue to suffer long-term and unquantifiable effects if the infringing EMSON products continue to be sold. When building its future product pipeline, the Company considers the wall climber a platform that can deliver multi-year innovation, including new licenses or features, because there is patent protection. The current market dynamics and infringer price erosion has challenged the company's ability to move forward with such innovations, which cost money and continued royalties to create and market.[9] (Keller Decl. ¶25-27.) The size and

---

[9] The presence of additional, third-party infringers on the market does not undermine Spin Master's ability to prove that Defendant's infringing conduct is causing Spin Master irreparable harm. The Federal Circuit has consistently held that the presence of other infringers on the market does not vitiate a patentee's argument for irreparable harm. *Pfizer Inc. v. Teva Pharmaceuticals, Inc.*, 429 F.3d 1364, 1381 (Fed. Cir. 2005) (affirming the district court's finding that the existence of other infringing products did not "negate" plaintiff's contention that it was being irreparably harmed because "'the fact that other infringers may be in the marketplace does not negate irreparable harm."). Indeed, the Federal Circuit has characterized the very proposition that the presence of other infringers on the market could lead to a finding of no irreparable harm as "perverse…" *Robert Bosch LLC v.*

future potential of the United States market -- which is being driven down by the infringing products -- is also big factor as to whether Spin Master can grow, or even sustain, its global business, because a strong United States market for current and future products is necessary to move forward with design and manufacturing for the total global market. *Id.* In short, Spin Master is losing current and future business and innovation opportunities because of EMSON's infringing importation and sales. Such irreparable harm, visited upon Spin Master by a direct competitor, weighs heavily in favor of the issuance of the requested preliminary injunction.

## IV. The Balance of Hardships Weighs Decidedly in Spin Master's Favor

The balance of hardships weighs decidedly in favor of Spin Master. If an injunction is denied, EMSON will continue capitalizing on the market that Spin Mater built, infringing Spin Master's Patents, and denying Spin Master its exclusive rights. Further, other infringers will be encouraged to ignore Spin Master's efforts to exclude them, or to enter into the market with new infringing products. Spin Master will lose its exclusivity to establish and maintain a market for its Zero Gravity® cars. *See Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1172 (Fed. Cir. 2014) (where defendant was "only non-licensed competitor in the market," balance of hardships favored patentee because this "suggest[ed] that this patent will have significantly less value if [the plaintiff] cannot use it to exclude an infringing product from the market"); *Glaxo Grp. Ltd. v. Apotex, Inc.*, 64 Fed. App'x 751, 756 (Fed. Cir. Apr. 22, 2003) (affirming grant of preliminary injunction and agreeing that balance of hardships favored the patentee because "additional generic

---

*Pylon Manufacturing Corp.*, 659 F.3d. 1142, 1151 (Fed. Cir. 2011). Spin Master does not have to "sue all infringers at once"—though it has sued many—to prove that EMSON's sales of Radical Racers causes irreparable harm to its business. *Id.* In fact, Spin Master's consistent and aggressive enforcement of its patents is evidence of its recognition of and profound alarm regarding the irreparable harm it experiences from infringement in general. Any prioritization of which infringers to sue is purely a matter of strategy—an approach which the Court in *Pfizer* endorsed, while explicitly stating that such strategy did not alter the irreparable harm analysis. *Pfizer*, 429 F.3d at 1381. "The absence of a two-supplier market" consisting of EMSON and Spin Master "does not weigh against a finding of irreparable harm." *See Id.*

competition would likely drive down the brand name's price and market share, causing permanent loss of customers and users of plaintiffs' patented product"); *see also Teledyne Indus., Inc. v. Windmere Prods, Inc.*, 433 F. Supp. 710, 740 (S.D. Fla. 1977) ("to permit [defendant] to infringe during the pendency of the lawsuit would in effect grant [defendant] a license valid as long as it can continue to contest this suit," which may "tempt[] [others] to begin infringement on these terms as well"). Competition from infringing products will further erode prices and Spin Master's market share. Allowing EMSON to continue its sales pending trial would let it build market share and benefit from Spin Master's creation of a market for vehicles that climb walls.

By contrast, EMSON's hardship if the preliminary injunction is granted is no greater than any other patent infringer's. EMSON's recent entry into the market weighs in favor of granting an injunction. *See Trebro*, 748 F.3d at 1171 (vacating denial of preliminary injunction and observing that, "[w]ith respect to the balance of the equities, the evidence suggests that [plaintiff] is an established company … losing business to a new entrant selling a likely-infringing product" even where the patentee was not currently practicing the patent). To the extent EMSON intends to argue that any costs it incurred in marketing and importing its product tip the scale in its favor, this is wholly incorrect. *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1330 (Fed. Cir. 2008) (finding "no abuse of discretion" where the district court chose "not to consider [the infringer's] expenses in designing and marketing [its product], since those expenses related to an infringing product").

Moreover, EMSON received actual notice of its infringement in August 2019 and has continued knowingly infringing the Wall Racer Patents. (PX-23; PZ-24; PX-25; Answer ¶ 17.) Such knowing infringement weighs in favor of granting an injunction. "Those who take calculated risks should be well aware that they thereby assume the risk of being put out of that business by the issuance of a preliminary injunction." *Jacobson v. Cox Paving Co.*, 1991 U.S. Dist. LEXIS

17787, at *59 (D. Ariz. May 20, 1991) (granting preliminary injunction and finding balance of hardships weighed in favor of injunction where defendant "was well aware of the [plaintiff's] … patents and made a calculated decision to bring an infringing product to market before the … patents expired"); *see, e.g.*, *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.3d 1573, 1581 (Fed. Cir. 1983) (reversing denial and remanding for issuance of preliminary injunction where balance favored plaintiff because defendant "knew of the [plaintiff's] patents when it designed [its infringing product] and took a calculated risk that it might infringe those patents"); *Read Corp. v. Viper Int'l*, 1996 U.S. App. LEXIS 3847, at *9 (Fed. Cir. Feb. 23, 1996) (affirming grant of preliminary injunction and endorsing lower court finding that "the balance of hardships favor[ed] plaintiff]" because "granting the injunction merely require[d defendant] to pay the consequences of its calculated risk that it might infringe [plaintiff's] patents").

EMSON's decision to forge ahead with its infringing Radical Racers—even after being expressly put on notice of Spin Master's Wall Racer Patents—means that any potential harm resulting from an injunction is caused by EMSON itself, and is insufficient to tip the balance of equities in its favor. Accordingly, this element strongly favors granting a preliminary injunction. *See*, *e.g.*, *Celsis*, 664 F.3d at 931 (affirming grant of preliminary injunction and finding equities favored injunction where "the preliminary record suggest[ed] that [defendant's] losses were the result of its own calculated risk in selling a product with knowledge of [plaintiff's] patent").

## V.     Enjoining Patent Infringement Advances the Public Interest

"[T]here exists a public interest in protecting rights secured by valid patents." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988). And there is no "critical public interest that would be injured by the grant of preliminary relief." *Id.*; *see Trebro*, 748 F.3d at 1172 (vacating denial of preliminary injunction where, "as to the public interest, there is scant evidence …

showing that an injunction would harm the public" because "[t]he patent deals with sod harvesting and covers a small market that may not have a broad-reaching effect").

The patented technology here involves toy cars, not life-saving medication. Thus, the public would not be harmed by an injunction against EMSON, and this factor weighs in favor of granting a preliminary injunction.

## VI. Alternatively, There are Serious Questions Going to the Merits, and the Balance of Hardships Tips Strongly in Spin Master's Favor, Also Justifying an Injunction

In the unlikely event that the Court were to find that Spin Master has not met its burden of demonstrating likelihood of success on the merits, the Court nevertheless should grant a preliminary injunction because there are "'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *See Citigroup*, 598 F.3d at 35 (citations omitted); *Time Warner*, 497 F.3d at 152-153.

## CONCLUSION

Spin Master has shown a likelihood of success of proving that EMSON infringes at least Claims 1, 21, and 23 of the '897 Patent. EMSON cannot not meet its heavy burden to demonstrate the '897 Patent is invalid. The balance of hardships favors Spin Master, and the public interest favors granting an injunction. Accordingly, the Court should grant a preliminary injunction against EMSON's importation, manufacture, use, and sale in the U.S. of the Infringing Products.

DATED:  November 22, 2019

Respectfully submitted,

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.

*/s/Kevin N. Ainsworth*
Kevin N. Ainsworth
Kaitlyn A. Crowe
Chrysler Center
666 Third Ave.
New York, NY 10017
Tel:  (212) 935-3000
Fax:  (212) 983-3115
kainsworth@mintz.com
kacrowe@mintz.com

Andrew D. Skale (*Pro Hac Vice* application
filed)
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Tel:  (858) 314-1500
Fax:  (858) 314-1501
adskale@mintz.com

*Attorneys for Plaintiff*
SPIN MASTER, LTD.

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on November 22, 2019, I electronically filed the foregoing document

with the Clerk of the Court for the Southern District of New York using the ECF System which

will send notification to the following registered participants of the ECF System as listed on the

Court's Notice of Electronic Filing:

John Zaccaria
Notaro, Michalos & Zaccaria P.C.
100 Dutch Hill Road
Suite 240
Orangeburg, NY 10962
Email: jzaccaria@notaromichalos.com

Alan Federbush
Notaro, Michalos & Zaccaria P.C.
100 Dutch Hill Road
Suite 240
Orangeburg, NY 10962
Email: alan.federbush@notaromichalos.com

Brian Joseph Doyle
Notaro, Michalos & Zaccaria P.C.
100 Dutch Hill Road
Suite 240
Orangeburg, NY 10962
Email: brian.doyle@notaromichalos.com

*/s/Kevin N. Ainsworth*
Kevin N. Ainsworth

93779632v.10