UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                       :
SPIN MASTER, LTD.,                     :          19cv9035 (DLC)
                                       :
                      Plaintiff,       :          OPINION AND ORDER
                                       :
            -v-                        :
                                       :
E. MISHAN & SONS, INC.,                :
                      Defendant.       :
                                       :
---------------------------------------X

APPEARANCES:

For plaintiff:
Kevin N. Ainsworth
Kaitlyn A. Crowe
Andrew D. Skale
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
Chrysler Center
666 Third Ave.
New York, N 10017
(212) 935-3000

For defendant:
John Zaccaria
Alan Federbush
Bradley S. Corsello
Brian J. Doyle
Notaro, Michalos & Zaccaria, P.C.
100 Dutch Hill Rd., Ste. 240
Orangeburg, NY 10962
(845) 359-7700


DENISE COTE, District Judge:

     On September 27, 2019, plaintiff Spin Master, Ltd. ("Spin

Master") filed this patent infringement action against defendant

E. Mishan & Sons, Inc. ("Emson").  On October 29, Spin Master

moved for a preliminary injunction to enjoin Emson from selling

its "Radical Racer" toy cars.  In its complaint, Spin Master contends that the Radical Racers infringe four patents covering patented technology that Spin Master has licensed for use in its "Zero Gravity" motorized toy cars that drive up walls and cling to ceilings.  Spin Master has moved for a preliminary injunction on only one of these patents, Spin Master's patent No. 9,675,897 (the "'897 Patent").  For the reasons that follow, Spin Master's October 29 motion is granted.

## Findings of Fact

### I.  Spin Master

Spin Master is a publicly-traded Canadian company with headquarters in Toronto.  It employs 1,800 individuals.  In 2018, its annual revenue worldwide was $1.6 billion, including $1.1 billion in North America.

### A. The License Agreement

Pursuant to an August 8, 2004 agreement between Spin Master and the named inventors of the patents (the "licensor"), the Wall Racer License Agreement (the "License Agreement"), Spin Master is a licensee of patent Nos. 7,753,755 (the "'755 Patent"), 7,980,916 (the "'916 Patent"), 8,979,609 (the "'609 Patent"), and the '897 Patent (collectively, the "Spin Master Patents").[1]

---

[1] Each Spin Mater Patent claims priority based on the same parent application that was filed in the United States Patent and

The License Agreement grants Spin Master "the sole and exclusive right and license . . . throughout the world . . . to design, make, have made, reproduce, modify, distribute, advertise, and sell and otherwise exploit" the Spin Master Patents "in any manner deemed appropriate or desirable by" Spin Master. It further provides that the licensor "will not offer or license to any other party and property substantially similar to the [Spin Master Patents] . . . nor will [it] utilize any such property itself in any manner which may conflict with the exclusive grant of rights hereunder."

The License Agreement authorizes Spin Master to "grant sublicenses of the [Spin Master Patents] . . . to arms length third parties, upon such terms and conditions as determined by [Spin Master] in its sole discretion." The License Agreement also provides that Spin Master "shall have the right to assign the rights granted by [the licensor] . . . without the consent of the [licensor]," but that the licensor "shall not assign this Agreement without the consent of [Spin Master], which consent may be withheld by [Spin Master] in its sole discretion."

The License Agreement gives Spin Master the "sole option to elect to prosecute or not prosecute a suit for infringement."

---

Trademark Office ("PTO") on July 11, 2005, and claims priority to a provisional application that was filed on December 30, 2004.

If Spin Master elects to prosecute an infringement action, Spin Master "may select legal counsel and shall pay all legal fees and costs of prosecution, and any recovery . . . shall belong exclusively to [Spin Master]," subject to the royalty rate provided in the License Agreement.

Only if Spin Master elects not to prosecute "any suit for infringement" may the licensor do so after providing "written notice" to Spin Master.[2] The licensor "may then select legal counsel reasonably acceptable to [Spin Master]." If the licensor prosecutes an infringement action, "[t]he balance of any recovery shall be shared equally by the parties." The License Agreement further provides that "[a]ll occurrences of third-party infringement of trademark, copyright, industrial design, or design patent shall be subject to action or inaction at the sole discretion of [Spin Master], and the [licensor] shall provide cooperation to [Spin Master] reasonably and in good faith in taking any action, as [Spin Master] may elect."

The License Agreement may be terminated by either party in the event of bankruptcy or material breach and failure to remedy. Spin Master has the sole right, however, to terminate

---

[2] On November 8, 2019, following the filing of this lawsuit, the License Agreement was amended to provide that Spin Master has the sole option to prosecute suits for patent infringement. The amendment also affirms that the License Agreement "remains in force and effect."

the License Agreement "at any time and for any reason or for no reason upon giving [the licensor] a ninety (90) day notice."

### B. Zero Gravity Toy Cars

The patented technology licensed to Spin Master pursuant to the License Agreement has been used in Spin Master's Zero Gravity toy cars since they were introduced to the market in 2005.  This technology permits the Zero Gravity cars to drive on walls and ceilings.  Zero Gravity vehicles are operated through a remote control that is not part of the patented technology at issue in this litigation.

Since their 2005 launch, Spin Master's Zero Gravity toys have received media acclaim.  A 2005 U.S. News & World Report article proclaimed of the toys' wall climbing feature, "It's a feat no remote control car has ever accomplished."  Popular Science, the Washington Post, and the New York Times also featured the Zero Gravity toys in 2005, as did Popular Science and Good Housekeeping in 2008.  In 2009, the Zero Gravity toys were recognized with an industry award, and in 2014, they made popular toy lists issued by Amazon and Walmart.  Most recently, in 2019, Popular Mechanics named the Zero Gravity vehicles the Best Toy at Toy Fair 2019, and Good Housekeeping bestowed on them the Best Toy Award.

Spin Master has spent more than $6.5 million in marketing and advertising Zero Gravity toys since their launch.  Since

5

2008, Spin Master has sold more than 4.8 million Zero Gravity vehicles worldwide.  Zero Gravity cars are sold online through Amazon and other retailers, as well as in U.S. retail stores, including Target and Walmart.  Walmart and Target represent over 90 percent of Spin Master's sales of Zero Gravity cars.

Spin Master has recorded sales of its Zero Gravity toy cars every year since 2008.  The cyclical nature of the toy industry has meant that Spin Master's sales often peak for two years when a new version of the toys is introduced and then dip when that version is phased out to make room for a new model.  In August 2019, Spin Master re-launched its marketing campaign for its Zero Gravity Laser toy cars, one model of the Zero Gravity toy, which allows the user to control the vehicle by shining a light beam, which the vehicle chases.  Spin Master's Zero Gravity Laser toy cars were introduced at a retail price of $34.99, which has since been cut to $29.99.  Spin Master has spent, or is planning to spend, about $860,000 marketing the Zero Gravity Laser toy cars for September through December 2019.

Spin Master also consistently invests in enforcing its intellectual property rights.  This suit is not the only action that Spin Master is currently pursuing to protect its property interests in the Zero Gravity cars.  Spin Master has another action pending in the Southern District, Spin Master Ltd. v. ACIPER, et al., No. 19cv6949 (VSB), a trademark infringement

suit, in which Spin Master was granted a temporary restraining order on August 27, 2019.

## II. Emson

Emson is a private, family-owned business that sells a wide variety of consumer products domestically and internationally. Emson is a New York corporation with offices and a showroom in New York. Emson has over 60 employees.

### A. Radical Racer Toy Cars

Like Spin Master's Zero Gravity vehicles, Emson's Radical Racers are toy cars that climb on walls and cling to ceilings.[3] In March 2019, following the February 2019 Toy Fair, at which Spin Master's Zero Gravity cars were proclaimed Best Toy by Popular Mechanics, Emson began taking orders for its Radical Racers from retail customers, and began shipments in July 2019. Emson has offered no evidence of any investment it made in the research for and development of its Radical Racers.

Emson sells Radical Racers through direct response television commercials as an "As Seen on TV" product and online through Amazon and a website, www.buyradicalracers.com. Emson's

---

[3] Emson has five models of its Radical Racers and argues that Spin Master has presented evidence on, and made infringement arguments with respect to, only one of these models. But, Emson only sells one model on its website and uses the same Universal Product Code ("UPC") code for each model. A customer ordering a Radical Racer cannot pick among models and can only choose between two colors. Spin Mater thus need not have presented evidence as to each model.

Radical Racers also are sold at Walmart and Target, in both their toy and As Seen on TV product departments. Emson has been marketing its Radical Racers since July 2019.

As of November 19, 2019, Emson has earned $5,251,624 in sales of Radical Racers to its retail customers and direct to consumers. Also as of November 19, 2019, Emson has had in stock, in transit, or ready for shipment from their manufacturing factory, approximately 345,829 units of Radical Racers. As of this date, Emson has had pending from retail customers approximately 160,000 unit orders, representing over $1,965,009 in gross sales. Emson estimates gross sales of Radical Racers through the end of 2020 to be $11,000,000, amounting to at least 1 million units sold. The Radical Racers retail for approximately $19.99. As of November 20, 2019, Emson has spent approximately $650,000 on advertising and marketing costs, and anticipates spending an additional $400,000 by the end of 2019.[4]

## III.  The '897 Patent

Spin Master's '897 Patent is the subject of this preliminary injunction motion. The '897 Patent, entitled "Wall Racer Toy Vehicles," issued on June 13, 2017. Filed on February

---

[4] Emson's proposed Findings of Fact and Conclusions of Law state that Emson plans to spend $400,000 by the end of 2020. The declaration it cites to states that this number is projected for the end of 2019.

26, 2015, the '897 Patent stems from a series of continuation
and continuation-in-part applications. The first application
was a provisional application filed on December 30, 2004.
Following the filing of the provisional application, an
application was filed on July 11, 2005, which issued as the '755
Patent. On February 23, 2009, a continuation-in-part
application was filed, which issued as the '916 Patent. On July
19, 2011, a continuation application was filed, which was
abandoned. On January 24, 2013, a continuation application was
filed, which issued as the '609 Patent.

The '897 Patent contains three independent claims. Each is
at issue in this motion. Claim 1 of the '897 Patent claims, in
full:

1. A toy vehicle comprising:

   a chassis comprising an undersurface, the chassis
   configured to mount on at least one wheel that is
   configured to move on a surface;
   a first motor configured to drive the at least one
   wheel; and

   a second motor configured to drive a fan that is
   configured <u>to draw air from a duct between the
   undersurface and the surface into a fan duct</u>, the
   duct comprising an entry portion, an exit portion
   connected to the fan duct, and a flat transition
   portion between the entry portion and the exit
   portion, the duct being structurally smooth from the
   entry portion, the duct being structurally smooth
   from the entry portion to at least a location
   vertically below the fan duct when the toy vehicle
   is placed on ground.

(Emphasis supplied.)

In full, Claim 21 recites:

1. A toy vehicle comprising:

a chassis comprising an undersurface;
at least one wheel operatively coupled to the
chassis and configured to move on a surface;

a fan connected to a fan duct <u>to receive free
flowing air drawn in by a duct that is connected to
the fan duct and is located between the undersurface
and the surface</u>, the receiving of the air by the fan
inducing a downforce urging the chassis towards the
surface, the duct comprising an entry portion
configured to receive a free flow of the air, a
transition portion configured to transport the air,
and an exit portion configured to exit the air to
the fan duct, the duct being structurally smooth
from the entry portion to at least a location
vertically below the fan duct when the toy vehicle
is placed on ground; and
a power source to drive the fan to induce the
downforce urging the chassis towards the surface.

(Emphasis supplied.)

Claim 23 provides in full:

A battery powered, remotely-controlled toy vehicle
configured for operation on a surface, comprising:

a chassis having an undersurface and having flexible
skirts extending along at least two opposite sides of
the undersurface of the chassis;

at least one wheel mounted on the chassis;

a receiver responsive to a control signal from a
remote transmitter;

at least one battery;

at least one motor being supplied with current from
the at least one battery responsive to signals
provided from the receiver, the at least one wheel
being controllably driven by the at least one motor; a
fan drive motor being supplied with current from the
at least one battery; a fan driven by the fan drive

motor, wherein <u>the fan draws air from an intake duct</u>
<u>between the undersurface of the chassis and the</u>
<u>surface into a fan duct, the undersurface of the</u>
<u>chassis being larger in area than the area of the fan</u>
<u>duct</u>, a differential pressure between a pressure of
the air flowing into the fan and a pressure of ambient
air inducing a force urging the chassis toward the
surface when the vehicle is placed on the surface with
the at least one wheel in contact with the surface and
the fan is operational, the intake duct comprising an
entry portion configured to receive the air, a
transition portion configured to transport the air,
and an exit portion configured to exit the air to the
fan duct, the intake duct being structurally smooth
from the entry portion to at least a location
vertically below the fan duct when the toy vehicle is
placed on ground.

(Emphasis supplied.)

The patent abstract explains that the invention provides

for a "motorized toy vehicle . . . that is capable of operating

on vertical and inverted horizontal surfaces such as walls and

ceilings, while being manufacturable at reasonable cost and

operable on batteries having sufficient lifetime to be

enjoyable."  The abstract explains that this is achieved through

"battery-powered fans" that "draw air from around all or defined

portions of the periphery of the chassis . . . through a

carefully-shaped duct, so that the air in the portion of the

duct immediately adjacent the surface flows at high velocity"

and low pressure.  The movement of the air at high velocity and

low pressure and the "relatively greater pressure of the

surrounding air urges the vehicle against the surface."

The specification explains that the invention operates the following way, as shown in Figures 1 and 2 of the '897 Patent, reproduced below:

> [A] fan 10 is mounted in a fan duct extending through a chassis 12, and is driven by a battery-powered motor 11 so as to draw a high-velocity stream of air in from around at least a portion of the periphery of chassis 12. The stream of air flows through an underbody venturi duct 15 formed between the underside of chassis 12 and the juxtaposed surface of wall W, and is exhausted on the "upper" side of chassis 12, that is, on the side away from the abutting wall W. Downforce D is created . . . due to the differential in pressure between the low pressure of the high-velocity air stream in the underbody venturi duct and the ambient air.



The patent specification further explains that this invention -- which relies on a flow of air through a duct -- accords with "Bernouilli's Principle." The specification clarifies that this technology is different from a device that moves along walls through "suction-adhering," which relies on a "relative vacuum." In contrast to the patented technology, a relative vacuum is created by:

> [A]ir [that] is drawn by a vacuum pump out from a sealed volume formed between the interior of the device and the wall, so that air pressure on the outer surface of the device forces it against the wall.

A "relative vacuum" requires that "an essentially air-tight seal be formed around the periphery of the device" and creates a problem of "friction between the sealing member and the wall, which impedes motion of the device and causes wear of the sealing members."  The vehicle envisioned by the '897 Patent avoids these problems because "seals . . . are unnecessary." Instead, this invention relies on "downforce" due to the "pressure differential" between the low pressure air in the duct and the higher pressure ambient air.

## IV.  Prosecution History

The distinction between a "vacuum" and "free flow air stream" also was used to overcome PTO rejections to claims of the '755 Patent, to which the '897 Patent claims priority.  A December 11, 2009 amendment to the '755 Patent includes remarks explaining that "the fan(s) according to the invention are used to create flow, not to maintain a vacuum," which "withdraw[s] air from a cavity sealed to the surface."

The remarks explain that prior art which teaches a vacuum effect is less "efficient" than the invention and had not "achieved th[e] goal" of operating on "battery life" that "can be sufficiently long to provide a toy that is not frustrating to use."  The invention, by contrast, provides for an "efficient venturi duct that realizes free flow of air," which permits

"enough downforce at low energy consumption to make a salable, useful toy."

The remarks further distinguish the invention from prior art that relies on a "partial vacuum," patent no. 3,246,711 to Snoeyenbos ("Snoeyenbos") and patent no. 3,810,515 to Ingro ("Ingro"). In Snoeyenbos, air is "withdrawn from within the volume, tend[s] to cause the bearing to be drawn toward the surface," but avoids "[c]omplete contact." And while Snoeyenbos does "mention Bernouilli's Principle in stating that air travelling a [sic] high velocity exhibits reduced pressure," Snoeyenbos does not teach a "venturi duct." Unlike the venturi duct taught in the invention, the "shape of Snoeyenbos' diaphragm . . . would be incapable of generating enough downforce to support a toy vehicle, at least absent air flowing in quantities requiring a far more powerful fan motor than is permissible to achieve adequate battery life." The venturi duct as taught in the invention, the remarks explain, is "essential to realizing a toy that is viable in the marketplace and which has efficient battery life to be enjoyable for the user."

Ingro teaches "a wall-climbing device intended to be caused to adhere to a vertical surface by suction created by pumping the ambient fluid [i.e. air] in from around the edge of a sealed body and exhausting it through an aperture in the opposite side of the body." In Ingro, there is a "narrow space 116 . . .

provided between the lower edge 117 of the skirt 118 of the body
101 and the proposed vertical surface to be climbed," which
provides clearance so that the edge 117 of the body 101 will not
bind or rub on the surface of the vertical wall 121." The
remarks explain that Ingro thus is "seeking to develop a partial
vacuum, not to define a venturi duct," and that Ingro does not
teach "downforce through a free flow of air through a venturi
duct." The figure from Ingro discussed in the remarks is
reproduced below.



## V. Prior Art

Emson has provided several prior art references in arguing
that the '897 Patent is invalid. The first is a Japanese Public
Patent Application 92-121291 to Kobayashi et al. for "Method of
Making Travel Motion with Surface Suction," published on April
22, 1992 ("Kobayashi"). Kobayashi was not listed in the
References Cited section of the '897 Patent. Kobayashi claims a
"method for making a travel motion with surface suction." It
explains that the technology is inventive because

[i]nstead of causing a chamber in the vacuum state to stick fast to a surface, said technology is configured to allow a fluid to be suctioned in an open state to thereby suction a surface.

With reference to the figure reproduced below, Kobayashi explains that it works as follows:

[W]hen the fluid is sucked inside as shown by the arrow B upon actuation of the fluid suction blower indicated by the reference code 4, an external fluid (i.e., air in the case of the present working example) tries to infiltrate through the narrow path in the open suction area, which is formed between the reference code 1 and the reference code 2, as shown by the arrow A.  However, because the passing cross section is small, the flow velocity increases to the extreme level, and great negative pressure is generated in this section due to the Bernouilli effect.



Another prior art reference is Korean Utility Model 96-28384U to Lim for "Powered suction machine for moving toys to allow moving on vertical or reverse horizontal planes," published on September 17, 1996 ("Lim").  Lim is not listed in the References Cited section of the '897 Patent.  The summary section of Lim states, "[t]his design is a powered suction machine for toys, operating on the difference in air pressure,

specifically a powered suction machine for motored toys that can be equipped on motored toys and allows free movement on vertical or reverse horizontal planes."  Lim discloses

> a powered suction machine that consists of a motor
> that turns the fan with the power to suction air, a
> rotating fan that suctions air with the driving force
> of the motor, . . . and a suction area that touches
> the vertical or reverse horizontal plane and forms the
> short gap, which is the channel where the suctioned
> air travels, adjusted to the height of the wheels and
> adhered on the planes.

A third reference is European Published Patent Application EP0030122 to Chapman et al. for "Ground Effect Vehicle," published on June 10, 1981 ("Chapman").  Chapman is not listed in the References Cited section of the '897 Patent.[5]  Chapman discloses a racing car that uses "ground effect" to generate "negative lift" and "increase the grip of the tyres on the road."  It states that the ground effect "depends on the shaping of the undersurface" of the car and "longitudinally extending skirts at its sides . . . so that air flow in the venturi duct has a velocity everywhere greater than at the airflow exit at the rear of the car."

## VI.  Procedural History

Emson was aware of the Spin Master Patents no later than October 2018.  Following the success of Spin Master's Zero

---

[5] An American version of Chapman was considered by the PTO, but the Chapman application cited by Emson as prior art is a European application.

Gravity model at the New York Toy Fair, Emson began offering Radical Racers to retailers in March 2019.

In August 2019, Spin Master learned that Emson was advertising and selling Radical Racers through Amazon.com and www.buyradicalracers.com. On August 26, 2019, counsel for Spin Master emailed Emson, asserting that the Radical Racers infringed the Spin Master Patents. On September 6, counsel for Emson responded that it would investigate Spin Master's infringement claim, and on September 10, explained that Emson was still in the process of investigating these claims. Around this time, in early September, Emson began hiring expert witnesses to defend against Spin Master's infringement claim.

Spin Master commenced this litigation on September 27, 2019. In October 2019, Spin Master learned that Emson had begun selling Radical Racers in Walmart and Target stores and websites. In Walmart and Target brick-and-mortar stores, the Radical Racers are the only competitor to Spin Master's Zero Gravity cars. In late October, Walmart's website listed the Radical Racer as "New" and a "Best Seller."

On October 29, Spin Master filed this preliminary injunction motion, seeking to enjoin Emson, during the pendency of this action, from making, importing, and selling its Radical Racer toy vehicles. On November 1, an initial conference was held to discuss Spin Master's preliminary injunction motion,

where it was decided, because of the importance of the holiday season to the parties' products, that a preliminary injunction hearing would be held on December 4, following expedited, targeted discovery.

The parties were directed to serve their initial interrogatories and requests pursuant to Rule 34, Fed. R. Civ. P., by November 4 and to respond to each other's interrogatories and requests by November 12. On November 12, Emson produced 8,500 pages of 400 prior air references. Following a meet and confer in which Emson agreed that it would identify the most pertinent prior art, Emson identified 29 references of prior art encompassing 200 pages. At a telephone conference on November 19, Emson was ordered to identify five principal pieces of prior art on which it intended to rely at the December 4 hearing.

On November 22, pursuant to this Court's individual practices, and with the consent of the parties, the direct testimony of the witnesses for the preliminary injunction hearing was submitted by affidavit. Spin Master submitted declarations from fact witnesses Christopher Harrs, Spin Master's Executive Vice President and General Counsel, and Mary Katherine Keller, Spin Master's Vice President of Marketing and General Business Unit Lead, Remote Control.[6] Emson submitted

---

[6] Spin Master also submitted a declaration by its counsel authenticating documents.

declarations from fact witness Edward I. Mishan, Emson's president, and expert witnesses Amir H. Hirsa, Ph.D., Ali Sadegh, Ph.D., P.E. CMfgE, James Donohue, and Michael T. Queller.[7] This was the first notice given by Emson that it would rely on expert testimony at the hearing.

On November 22, both parties also submitted legal memoranda in support of their proposed findings of fact and conclusions of law. On November 27, both parties submitted reply briefs.

The preliminary injunction hearing was held on December 4, 2019. Spin Master called Harrs and Keller as witnesses, and Emson cross-examined them both. Emson called Mishan, Hirsa, Sadegh, Donohue, and Queller as witnesses, and Spin Master cross-examined all of them but Donohue. At the end of the hearing, the Court announced that it would issue a preliminary injunction.

This Opinion contains the Court's findings of fact and conclusions of law. The findings of fact are principally recited above, but are also found in the conclusions of law.

_____

[7] Emson also submitted declarations by two translators, Yukie Hirose and Yesul Lee, who translated Kobayashi and Lim from Japanese and Korean, respectively, to English. Additionally, Emson submitted declarations by its counsel authenticating documents.

## Conclusions of Law

"[A] preliminary injunction is an extraordinary remedy never awarded as right." Beniseck v. Lamone, 138 S. Ct. 1942, 1943 (2018) (per curiam). A party seeking a preliminary injunction must demonstrate:

> (1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction.

Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 895 (2d Cir. 2015) (citation omitted).

In a patent infringement action, "[w]ith respect to establishing a likelihood of success on the merits, the patentee seeking a preliminary injunction in a patent infringement suit must show that it will likely prove infringement, and that it will likely withstand challenges, if any, to the validity of the patent." Tinnus Enterprises, LLC v. Telebrands Corp., 846 F.3d 1190, 1202 (Fed. Cir. 2017) (citation omitted). "An accused infringer can defeat a showing of likelihood of success on the merits by demonstrating a substantial question of validity or infringement." Id. (citation omitted). If the accused infringer "raises a substantial question concerning either infringement or validity, i.e., asserts an infringement or

21

invalidity defense that the patentee cannot prove lacks substantial merit, the preliminary injunction will not issue." Amazon.com v. Barnesandnoble, Inc., 239 F.3d 1343, 1350-51 (Fed. Cir. 2001) (citation omitted).

## I. Standing

First raising this argument in its reply brief of November 27, Emson contends that Spin Master lacks standing to bring this suit because it is a mere licensee of the '897 Patent and lacks substantial rights under the License Agreement. Title 35 allows a "patentee" to bring a civil action for patent infringement. 35 U.S.C. § 281. "The term patentee include the original patentee (whether the inventor or original assignee) and 'successors in title.'" Lone Star Silicon Innovations LLC v. Nanya Tech. Corp., 925 F.3d 1225, 1229 (Fed. Cir. 2019) (citation omitted). It does not include licensees. Id.

In distinguishing between "an assignment" and a "mere license," a court must "examine whether the agreement transferred all substantial rights to the patents." Id. (citation omitted). The "ultimate task" for a court is not to "tally the number of rights retained against those transferred," but to examine the "totality" of the agreement to determine whether a party other than the original patentee has established that it obtained "all substantial rights in the patent." Id. (citation omitted). The "exclusive right to make, use, and

sell" the invention and the "retained right to sue accused infringers and license the patent are the most important factors in determining whether an agreement transfers sufficient rights to render the other party the owner of the patent." Diamond Coating Techs., LLC v. Hyundai Moto Am., 823 F.3d 615, 619 (Fed. Cir. 2016) (citation omitted).

With respect to an "exclusive right to make, use, and sell" the licensed technology, the License Agreement broadly grants Spin Master an exclusive license. This wholesale grant of rights to Spin Master is only limited by the requirement that Spin Master introduce a product utilizing the licensed technology prior to February 2006 and to pay $100,000 in royalties to the licensor each year. In the event Spin Master fails to do so, the licensor would not then be free to sell the licensed technology, but could only sell or license a "Similar Product." This broad grant of rights weighs in favor of finding that Spin Master has substantial rights under the License Agreement.

The License Agreement also gives Spin Master the "sole option to elect to prosecute or not prosecute a suit for infringement." Spin Master is entitled to fully control the decision-making of the litigation, including the choice to institute the litigation in the first place and to choose its legal counsel. Subject only to the royalty agreement, Spin

Master has the exclusive right to "any recovery."  Under the
pre-amendment version of the License Agreement, which is the
subject of this Opinion's standing analysis, the licensor may
pursue an infringement suit, but only if Spin Master chooses not
to.[8]  Additionally, if the licensor elects to pursue such an
action, its legal counsel must be "reasonably acceptable" to
Spin Master.  Spin Master is also entitled to share equally in
any recovery.

The License Agreement also provides Spin Master broad
licensing rights.  Spin Master has "the sole and exclusive right
and license . . . throughout the world . . . to design, make,
have made, reproduce, modify, distribute, advertise, and sell
and otherwise exploit" the Spin Master Patents "in any manner
deemed appropriate or desirable by" Spin Master.  The licensor
may not "offer or license to any other party and property
substantially similar to the [Spin Master Patents,]" and it may
not "utilize any such property itself in any manner which may
conflict with the exclusive grant of rights hereunder."  Spin
Master is also authorized to grant sublicenses "in its sole

_____

[8] A party may not cure a standing defect by a "nunc pro tunc"
assignment of rights that occurs after a plaintiff has filed
suit.  Alps South, LLC v. Ohio Willow Wood Co., 787 F.3d 1379,
1384 (Fed. Cir. 2015).  "Nunc pro tunc assignments are not
sufficient to confer retroactive standing." Id.  It is not
necessary to consider whether the November 8, 2019 amendment to
the License Agreement would create standing, because Spin Master
has standing under the pre-amendment License Agreement.

discretion."  Spin Master does not need the licensor's consent
to "assign the rights granted by [the licensor]."  By contrast,
the licensor may "not assign this Agreement without the consent
of [Spin Master], which consent may be withheld by [Spin Master]
in its sole discretion."

Considering the "totality" of the License Agreement, Spin
Master has "substantial rights" under the Patents.  Spin Master
therefore has standing to bring this infringement action.

Emson's arguments to the contrary are not convincing.
Emson argues that Spin Master lacks substantial rights because
the licensor retains the right to (1) use and sell the patented
product; (2) assert the patent; (3) share in damages; and (4)
terminate the license.  These broad arguments misconstrue the
limited and conditional nature of these rights, as well as how
they operate as a "totality."  The cases Emson cites in support
have found that a licensee lacks standing based on far less
qualified rights than are present in the License Agreement.  For
instance, in Propat Int'l Corp. v. RPost, Inc., the licensor
retained a right to make "litigation decisions" and the
"unrestricted power to bar [the licensee] from transferring its
interest in the patent to a third party."  473 F.3d 1187, 1191
(Fed. Cir. 2007).  In Fieldturf, Inc. v. Sw. Rec. Indus., the
licensee did not have the right to enforce the patent against
infringers nor did it address whether the licensee had the right

to "develop, display, commercialize, and market" embodiments of the patent. 357 F.3d 1266, 1269 (Fed. Cir. 2004). Similarly, in <u>Abbott Labs. v. Diamedix Corp.</u>, the licensor "retained the right to make and use, for its own benefit, products embodying the inventions claimed in the patents, as well as the right to sell such products to end users." 47 F.3d 1128, 1132 (Fed. Cir. 1995). Emson thus has not undercut Spin Master's evidence that it has standing to bring this lawsuit.

## II. Likelihood of Success on the Merits

Spin Master argues it is likely to succeed on the merits of its infringement action. Emson counters that there is a substantial question as to Spin Master's likelihood of success because (1) assuming the '897 Patent is construed as Emson suggests, the Radical Racers do not infringe the '897 Patent and (2) the '897 Patent is likely to be found invalid as anticipated or obvious in light of prior art.

### A. Patent Infringement

"Determining the likelihood of infringement requires two steps." <u>Pfizer, Inc. v. Teva Pharmaceuticals, USA, Inc.</u>, 429 F.3d 1364, 1372 (Fed. Cir 2005). First, "claim construction," and second, "a comparison of the properly construed claims to the accused product." <u>Id.</u> Emson does not deny that the Radical Racers infringe the '897 Patent if the patent is construed as Spin Master contends it should be.

## 1. Claim Construction

In construing a patent claim, which is a question of law, courts "should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." Am. Calcar, Inc. v. Am. Honda Motor Co., Inc., 651 F.3d 1318, 1336 (Fed. Cir. 2011) (citation omitted). Courts, however, should not read meaning into claim language that is clear on its face. See Tate Access Floors, Inc. v. Interface Architectural Res., Inc., 279 F.3d 1357, 1371 (Fed. Cir. 2002). Claim construction is not a backdoor process by which the scope of a claim is narrowed or expanded. See Terlep v. Brinkmann Corp., 418 F.3d 1379, 1382 (Fed. Cir. 2005).

"In construing claims, district courts give claims their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Cont'l Circuits LLC v. Intel Corp., 915 F.3d 788, 796 (Fed. Cir. 2019) (citation omitted). The ordinary meaning of a claim term is its meaning "to the ordinary artisan after reading the entire patent." Aylus Networks, Inc. v. Apple Inc., 856 F.3d 1353, 1358 (Fed. Cir. 2017) (citation omitted). Thus, ordinary meaning is not something that is determined "in a vacuum." Eon Corp. IP

Holdings v. Silver Spring Networks, 815 F.3d 1314, 1320 (Fed. Cir. 2016) (citation omitted).

If a claim term does not have an ordinary meaning, and its meaning is not clear from a plain reading of the claim, courts turn in particular to the specification to assist in claim construction. Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 711 F.3d 1348, 1361 (Fed. Cir. 2013). Through the specification, a patentee "can act as his own lexicographer to specifically define terms of a claim contrary to their ordinary meaning." Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc., 467 F.3d 1370, 1376 (Fed. Cir. 2006) (citation omitted). But, "[t]o act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning." Cont'l Circuits LLC, 915 F.3d at 796 (citation omitted). "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." Power Integrations, 711 F.3d at 1361 (citation omitted). Since the purpose of the specification is "to teach and enable those of skill in the art to make and use the invention," it often provides "an example of how to practice the invention." Phillips v. AWH Corp., 415 F.3d 1303, 1323 (Fed. Cir. 2005). But, while courts use the specification "to interpret the meaning of a claim," they must "avoid the danger of reading limitations from the specification

into the claim" itself.  Id.  Although the specification often describes specific embodiments of the invention, the Federal Circuit has repeatedly warned against confining the claims to those embodiments.  Id.  Moreover, "[w]hile claims are to be interpreted in light of the specification, all that appears in the specification is not necessarily within the scope of the claims and thus entitled to protection."  Novo Nordisk of N. Am., Inc. v. Genentech, Inc., 77 F.3d 1364, 1369 (Fed. Cir. 1996).  The claimed invention should not be limited to "preferred embodiments or specific examples in the specification."  Williamson v. Citrix Online, LLC, 792 F.3d 1339, 1346-47 (Fed Cir. 2015) (citation omitted).

The prosecution history may "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution."  Phillips, 415 F.3d at 1317.  Indeed, because the prosecution history includes the applicant's express representations made to the PTO examiner, it may be "of critical significance in determining the meaning of the claims."  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  "Any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant" to claim construction.  Fenner Investments, Ltd. v. Cellco P'ship, 778 F.3d 1320, 1323 (Fed. Cir. 2015).

Under the doctrine of "prosecution disclaimer," "[w]hen the patentee makes clear and unmistakable prosecution arguments limiting the meaning of a claim term in order to overcome a rejection, the courts limit the relevant claim term to exclude the disclaimed matter." 01 Communique Laboratory, Inc. v. LogMeIn, Inc., 687 F.3d 1292, 1297 (Fed. Cir. 2012) (citation omitted). "When the application of prosecution disclaimer involves statements from prosecution of a familial patent relating to the same subject matter as the claim language at issue in the patent being construed, those statements in the familial application are relevant in construing the claims at issue." Ormco Corp. v. Align Tech., Inc., 498 F.3d 1307, 1314 (Fed. Cir. 2007).

Courts also may rely on the doctrine of claim differentiation, which "creates a presumption that . . . dependent claim limitations are not included in the independent claim." GE Lighting Solutions, LLC v. AgiLight, Inc., 750 F.3d 1304, 1310 (Fed. Cir. 2014). "The doctrine of claim differentiation stems from the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." Seachange Intern., Inc. v. C-COR, Inc., 413 F.3d 1361, 1368 (Fed. Cir. 2005). And while the doctrine is strongest where the "limitation sought to be 'read into' an independent claim

already appears in a dependent claim, . . . there is still a presumption that two independent claims have different scope when different words or phrases are used in those claims." Id. at 1369 (citation omitted). "Of course, claim differentiation is not a hard and fast rule, and the presumption can be overcome by a contrary construction required by the specification or prosecution history, such as via a disclaimer." GE Lighting Solutions, 750 F.3d at 1310.

In construing claims, a court may also consider extrinsic evidence, such as dictionaries and treatises, but such extrinsic evidence is "generally of less significance than the intrinsic record." Takeda Pharma. Co. Ltd. v. Zydus Pharma. USA, Inc., 743 F.3d 1359, 1363 (Fed. Cir. 2014). If the meaning of the claim is clear from the intrinsic evidence alone, resort to extrinsic evidence is improper. Boss Control, Inc. v. Bombardier Inc., 410 F.3d 1372, 1377 (Fed. Cir. 2005). "[A] court may not use the accused product or process as a form of extrinsic evidence to supply limitations for patent claim language." Wilson Sporting Goods Co. v. Hillerich & Bradsby Co., 442 F.3d 1322, 1331 (Fed. Cir. 2006). This rule, however, "does not forbid awareness of the accused product or process to supply the parameters and scope of the infringement analysis, including its claim construction component." Id.

Emson contends that four terms in the '897 Patent require claim construction. These terms are: (1) entry portion, (2) structurally smooth, (3) duct, and (4) fan. The plaintiff asserts that only the phrase structurally smooth requires construction. A claim construction analysis of each term follows.

Before construing each term, however, it is useful to repeat Claim 1. Claim 1 provides:

1. A toy vehicle comprising:

> a chassis comprising an undersurface, the chassis configured to mount on at least one wheel that is configured to move on a surface;

> a first motor configured to drive the at least one wheel; and

> a second motor configured to drive a <u>fan</u> that is configured to draw air from a <u>duct</u> between the undersurface and the surface into a fan duct, the <u>duct</u> comprising <u>an entry portion</u>, an exit portion connected to the fan duct, and a flat transition portion between <u>the entry portion</u> and the exit portion, <u>the duct being structurally smooth from the entry portion, the duct being structurally smooth from the entry portion</u> to at least a location vertically below the fan duct when the toy vehicle is placed on ground.

(Emphasis supplied.)

In presenting its claim construction, Emson heavily relies on Figure 12. Figure 12 is reproduced below.



**Entry Portion**

The term entry portion refers to the portion of the duct at which the air enters.  Referring to Figure 12 and certain passages in the specification, Emson proposes that the term "entry portion" be construed as an "entry portion with a radiused opening."  As used by Emson, radiused connotes curved. Spin Master disputes that "radiused" limits the term entry portion.

Spin Master is correct.  The scope of the claim is not limited to "radiused" entry portions.  "It is the claims, not the written description, which define the scope of the patent right."  <u>Williamson</u>, 792 F.3d at 1346 (citation omitted).  A claimed invention is not limited to preferred embodiments or specific examples in the specification.  <u>Id.</u>

**Structurally Smooth**

The next term at issue is "structurally smooth."  Both parties propose constructions for this term.  In relevant part, Claim 1 provides, "the duct being structurally smooth from the

entry portion to at least a location vertically below the fan duct when the toy vehicle is placed on ground."

Spin Master proposes that the term "structurally smooth" be construed as: "(a) in the transition portion, [the duct] is designed to reduce friction between it and the surface as the vehicle is propelled . . . ; and (b) in the exit portion, [the duct] is designed to smoothly connect to the fan duct."  Emson proposes that the term "structurally smooth" be construed to mean that "the entire duct (from the entry portion to vertically below the fan duct) is a smooth surface (i.e., free from projections or unevenness of surface) to minimize air turbulence."

The term "structurally smooth" is construed to mean that the duct is constructed in a way that creates an unimpeded and non-turbulent airflow from the entry portion of the duct.  This reading of "structurally smooth" is bolstered by language in the specification, which explains that the "undersurface of the chassis is smooth" in order to provide "non-turbulent airflow." Language in the specification renders implausible Emson's proposed construction.  The specification explains:

> Slight 'bumps' might also be formed at the diagonal
> corners of the chassis and wall surface [].  It is
> found that the friction experienced in use of the toy
> of the invention with walls and other surfaces of
> typical smoothness -- e.g., conventionally painted
> interior walls -- is sufficiently small as to present
> no difficulty, and likewise that the slight asymmetry

in the airflow path under the chassis presents no
difficulty.

Emson's reading of "structurally smooth," which proposes that
the surface of the entire duct be "free from projections or
unevenness of surface," is incorrect.

**Duct**

Emson proposes that the term "duct" be defined as the
"entire three-dimensional region formed by the undersurface of
the chassis, the wall surface, and the skirts."  In doing so,
Emson relies on two references in the specification to the use
of skirts that extend from the chassis to form a partial seal.

Spin Master is correct that the ordinary meaning of the
term duct is sufficient.  In particular, the two references to
skirts contained in the description of preferred embodiments
should not be used to import limitations into the claims.

**Fan**

Emson does not actually offer any construction of the term
fan, but uses its claim construction argument regarding the term
to urge the following: that the term fan may not be read as an
apparatus that operates on a vacuum or even a partial vacuum
effect.  In doing so, Emson relies on the prosecution history of
the '897 Patent and the '755 Patent.

Spin Master contends that the ordinary meaning of the term
fan is the appropriate construction and disagrees with Emson's

argument. First, Spin Master contends that neither Claim 1 nor Claim 23 discloses that there be a "free flow" of air to the fan, while acknowledging that Claim 21 recites that the fan receives "free flowing air." Second, Spin Master argues that Emson improperly relies on language disclaiming a fan that creates a "partial vacuum" because the disavowal arose in connection with the prosecution of the '755 Patent, not the '897 Patent. Spin Master points out that the '755 Patent claims a "venturi duct" while the '897 Patent claims at issue here only refer to a "duct." A dependent claim in the '897 Patent includes a venturi duct as an element. Claims 1, 21, and 23 do not.

Resort to the specification and prosecution history is not appropriate here. That is because the meaning of the term fan is clear from a plain reading of the claim. As stated in Claim 1, the fan is one that is "configured to draw air from a duct between the undersurface and the surface into a fan duct." In any event, as discussed below, Spin Master has shown a likelihood of showing at trial that the Radical Racers' fan generates free flowing air. Thus, even if the term fan were construed as Emson proposes, it would not assist Emson in avoiding a finding of infringement.

## 2. Comparison of claims to the accused product

Spin Master argues that the Radical Racers literally infringe Claim 1, Claim 21, and Claim 23 of the '897 Patent. "After claim construction, the fact finder compares the properly construed claims to the accused [product]." Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 812 (Fed. Cir. 2002). "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." Duncan Parking Techs., Inc. v. IPS Group, Inc., 914 F.3d 1347, 1360 (Fed. Cir. 2019).

With respect to Claim 1, which is illustrative of Claim 21 and Claim 23, it is undisputed that the Radical Racers product is a "toy vehicle" with a "chassis comprising an undersurface" and that the chassis is "configured to mount on at least one wheel that is configured to move on a surface." It also is undisputed that the Radical Racers are equipped with a "motor configured to drive" at least one of the wheels of the toy.

For the disputed elements of Claim 1, Spin Master has provided models of the Radical Racers to demonstrate that each element of the claim is found in the toys. The models succeed in showing that all of the elements of the claims appear in the Radical Racers. To start, the Radical Racers toy is comprised of a fan inside a fan duct. The fan duct connects to a duct, which is comprised of an entry portion, exit portion, and flat

transition portion between the entry portion and exit portion. The duct is structurally smooth from the entry portion to a location beneath the fan duct.  The below photograph illustrates this.



In arguing that the Radical Racers do not infringe the '897 Patent, Emson relies on its preferred constructions of the terms entry portion, structurally smooth, duct, and fan.  Because Emson's proposed constructions have not been adopted by this Opinion, Emson's arguments fail.

First, the term "entry portion" has not been construed as an "entry portion with a radiused opening."  Emson's arguments that the Radical Racers' entry portion is a "right angle" and thus not found in the claim therefore fails.

Next, the term "structurally smooth" has been construed to mean that the duct is constructed in a way that allow unimpeded and non-turbulent airflow from the entry portion of the duct. Thus, Emson's argument that small bumps and holes on the

undersurface of the chassis of the Radical Racers preclude a finding of infringement fails. Similarly, Emson's argument that a "steep angle" in two of the exit portions of the Radical Racers' duct makes its product non-infringing also fails. The angle at two of the exit portions does not impede or preclude non-turbulent airflow into the fan duct. Likewise, Emson cannot succeed in arguing that the Radical Racers do not infringe because certain models of the toy have concave, arched, or ridged undersurfaces. The undersurface of the chassis need not be a perfectly flat plain to fall within the scope of the claim.

Finally, Emson argues that the Radical Racers' fan differs from the fan described in the '897 Patent because the Radical Racers' fan uses the vacuum technique disclaimed by the patentees. But, the term fan has been given its ordinary meaning and has not been construed to disclaim any apparatus that operates on a vacuum or even a partial vacuum effect.

Moreover, Emson has not created a "substantial question" as to whether its fan is different than the fan disclosed in the '897 Patent. While Emson has submitted expert testimony opining that the Radical Racers' "downforce is a result of a vacuum, albeit leaky," the expert has not shown that the design of the Radical Racers -- much less the product's fan -- creates downforce in a way other than that taught by the '897 Patent. This omission is significant. Moreover, Emson's expert

clarified that in using the term "vacuum," he only meant "less than atmospheric pressure" or "negative pressure." He also explained that the fan in the Radical Racers is responsible for any air pressure difference he measured under the toy.

The expert provides pressurized maps that show pressure distribution in the undersurface of a Radical Racer, except for the perimeter of the undersurface. The expert made the maps by sequentially and separately measuring 52 different points on the undersurface of the Radical Racer chassis. The expert placed the Radical Racer atop a measuring device with the fan turned on, but the toy remaining stationary. Thus, the test does not reflect air flow that is created during the forward propulsion of the vehicle, nor does the test measure any outflow from the fan. Given these limitations, the maps do not provide a complete depiction of how downforce is effected in a Radical Racer car. In any event, the results of these maps are inconclusive at best, as many examples in fact show the very low pressure pockets near the fan duct that one would expect to occur with a toy designed with the technology patented in the '897 Patent.

While both parties are free to develop their arguments and submit additional expert reports as this litigation progresses, "it is particularly appropriate at the preliminary injunction stage not to set a hard and fast rule that infringement can only

be shown through quantitative testing of an accused product."
Pfizer, Inc. v. Teva Pharm., USA, Inc., 429 F.3d 1364, 1377
(Fed. Cir. 2005).  Emson has failed to create a substantial
question as to infringement.

### B. Patent Validity

Emson argues that the '897 Patent is invalid as anticipated
and as obvious in light of prior art.  A party seeking to
challenge a patent as invalid at trial must do so by clear and
convincing evidence.  Sciele Pharma Inc. v. Lupin Ltd., 684 F.3d
1253, 1260 (Fed. Cir. 2012).

At the preliminary injunction stage, "[t]he burden on the
accused infringer to show a substantial question of invalidity .
. . is lower than what is required to prove invalidity at
trial."  Tinnus Enterprises, 846 F.3d at 1205 (citation
omitted).  "Vulnerability is the issue at the preliminary
injunction stage, while validity is the issue at trial."  Id.
(citation omitted).  Each issued patent is presumed valid under
35 U.S.C. § 282.  Titan Tire Corp. v. New Holland, Inc., 566
F.3d 1372, 1376 (Fed. Cir. 2009).

> [I]f the trial court concludes there is a "substantial
> question" concerning the validity of the patent,
> meaning that the alleged infringer has presented an
> invalidity defense that the patentee has not shown
> lacks substantial merit, it necessarily follows that
> the patentee has not succeeded in showing it is likely
> to succeed at trial on the merits of the validity
> issue.

Id. at 1379 (citation omitted).

Meeting the burden to establish invalidity may be "harder" where the "invalidity contention is based upon the same argument on the same reference that the PTO already considered." Sciele, 684 F.3d at 1260 (citation omitted); see also Intercontinental Great Brands LLC v. Kellogg N.A. Co., 869 F.3d 1336, 1350 (Fed. Cir. 2017). Importantly, however, whether a reference was before the PTO "goes to the weight of the evidence," not the burden of proof. Sciele, 684 F.3d at 1260.

### 1. Anticipated

Emson argues that Claims 1 and 21 of the '897 Patent are anticipated by Kobayashi. They are not. Emson makes no anticipation argument as to Claim 23.

Under 35 U.S.C. § 102, "[a] patent claim is invalid as anticipated only if each and every element of the claim is expressly or inherently disclosed in a single prior art reference." Guangdong Alison Hi-Tech v. Int'l Trade Commission, 936 F.3d 1353, 1364-65 (Fed. Cir. 2017). "[A]nticipation requires there to be no difference between the claimed invention and the reference disclosure as viewed by a person of ordinary skill in the art." Bettcher Indus., Inc. v. Bunzi USA, Inc., 661 F.3d 629, 641 (Fed. Cir. 2011) (citation omitted). "[T]he dispositive question regarding anticipation is whether one skilled in the art would reasonably understand or infer from the

prior art reference's teaching that every claim element was disclosed in that single reference." Dayco Products, Inc. v. Total Containment, Inc., 329 F.3d 1358, 1368 (Fed. Cir. 2003) (citation omitted).

Kobayashi is a 1992 Japanese patent that describes a vacuum for cleaning beds, walls, and ceilings through surface suction. It allows "a travel motion by suction" regardless of the roughness or temperature of the surface. Among other things, Kobayashi does not disclose a fan, and therefore does not anticipate the '897 Patent.

### 2. Obviousness

Emson argues that Claims 1 and 21 of the '897 Patent are obvious in light of Lim and Kobayashi.[9] As for Claim 23, Emson's sole assertion of obviousness rests on the combination of four prior art references. Emson has not shown that its assertions of invalidity due to obviousness should prevent the issuance of a preliminary injunction.

Under 35 U.S.C. § 103, "a patent may not issue if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would

_____

[9] In its opposition brief, Emson contends that Claims 1, 21, and 23 are obvious in light of Lim and known technology. But, Emson's brief relies on claim charts submitted by its expert, Professor Sadegh, in his declaration. This Opinion refers to the combinations of prior art found in Professor Sadegh's charts.

have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." PAR Pharmaceutical, Inc. v. TWI Pharmaceuticals, Inc., 773 F.3d 1186, 1193 (Fed. Cir. 2014) (quoting statute). Obviousness is a question of law based on underlying factual determinations, including: (1) the scope and content of prior art; (2) differences between the prior art and claims; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness, such as "commercial success, long felt but unsolved needs, [and the] failure of others." Apple Inc. v. Samsung Elecs. Co., 839 F.3d 1034, 1048 (Fed. Cir. 2016) (citation omitted).

If the assertion of obviousness is premised on a combination of prior art references, then a court considers whether a person having ordinary skill in the art "would have been motivated to combine the prior art to achieve the claimed invention and whether there would have been a reasonable expectation of success in doing so." In re Warsaw Orthopedic, Inc., 832 F.3d 1327, 1333 (Fed. Cir. 2016) (citation omitted). "[A] conclusory assertion with no explanation is inadequate to support a finding that there would have been a motivation to combine because this type of finding, without more, tracks the ex post reasoning" the Supreme Court has "warned of and fails to identify any actual reason why a skilled artisan would have

combined the elements in the manner claimed." <u>TQ Delta, LLC v.</u> <u>CISCO Sys., Inc.</u>, 2019 WL 6222844, at *4, --F.3d-- (Fed. Cir. 2019) (citation omitted).  All of the elements of the invention must be found in the combination of the prior art references. <u>PAR Pharmaceuticals</u>, 773 F.3d at 1194.

Emson asserts that the three '897 Patent claims are obvious in light of a combination of prior art.  That assertion can be swiftly rejected.  Emson has failed to show that there was any motivation to combine the prior art references.

Further, the commercial success of Spin Master's Zero Gravity cars weighs heavily in favor of finding non-obviousness. Since 2005, the Zero Gravity toys have been the recipients of awards and featured in numerous publications, including a 2005 <u>U.S. News & World Report</u> article proclaiming the toys' wall climbing feature, "a feat no remote control car has ever accomplished."  Since 2008, Spin Master has sold more than 4.8 million Zero Gravity vehicles worldwide.  Emson has not addressed the commercial success of the Zero Gravity cars in arguing that the '897 Patent is invalid as obvious.  For each of these reasons, Emson has failed to establish a substantial question as to the '897 Patent's validity.

## III.  **Irreparable Harm**

Spin Master argues that it has demonstrated that it will be irreparably harmed if it is denied a preliminary injunction.  "A

party seeking a preliminary injunction must establish that it is likely to suffer irreparable harm if the preliminary injunction is not granted and there is a causal nexus between the alleged infringement and the alleged harm." Metalcraft of Mayville, Inc. v. The Toroo Co., 848 F.3d 1358, 1368 (Fed. Cir. 2017).

Factors pertinent to an irreparable harm inquiry include the likelihood of price erosion, loss of market share, loss of goodwill, and loss of access to customers, although "[e]vidence of potential lost sales alone does not demonstrate irreparable harm." Metalcraft, 848 F.3d at 1368; Trebro Mfg., Inc. v. Firefly Equipment, LLC, 748 F.3d 1159, 1170 (Fed. Cir. 2014); Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1362 (Fed. Cir. 2008). "A patentee does not have to sue all infringers at once." Pfizer, Inc., 429 F.3d at 1381. "Picking off one infringer at a time is not inconsistent with being irreparably harmed." Id. A court may also consider a party's "delay in bringing an infringement action and seeking a preliminary injunction," which may "suggest that the patentee is not irreparably harmed by the infringement." Apple, Inc. v. Samsung Elecs. Co., 678 F.3d 1314, 1325 (Fed. Cir. 2012).

Spin Master has established irreparable harm. First, Emson's Radical Racers directly compete with Spin Master's Zero Gravity cars as the products are sold by many of the same retailers. In particular, in Walmart and Target brick-and-

mortar stores, Radical Racers are its only competitor.  Second, in 2019, the retail price of Zero Gravity cars was cut from $34.99 to $29.99 due to competition from the Radical Racers in these stores.  Third, Spin Master has provided credible evidence that current market dynamics created by Emson's infringing activity and the resulting price erosion have and will challenge Spin Master's ability to spend on further innovation and development of the Zero Gravity pipeline.  All of these harms arise directly from the patented feature of the Zero Gravity cars, which allows them to climb walls in defiance of gravity. It is that gravity-defying feature that Emson emphasizes in promoting the Radical Racers.  This evidence demonstrates that Spin Master will suffer unquantifiable injury as Radical Racers chip away at Spin Master's customer base, brand recognition, and price point over time.

None of Emson's arguments to the contrary are convincing. First, Emson argues that Spin Master has already met its most recent 2019 sales projection and thus has failed to demonstrate harm.  But, earlier this year, Spin Master had higher projections, which it reduced based on the prevalence of infringing products in the marketplace.  And, in any event, a loss in market share harms Spin Master, regardless of whether its target has been reached.

Next, Emson contends that Spin Master did not allege that it dropped the price of its toys to compete with the Radical Racers, specifically.  But, Spin Master's Vice President of Marketing testified that the price drop was caused by the Radical Racers.  And this is commonsense -- the Radical Racers are the only competitors of Zero Gravity cars in Walmart and Target stores.  Additionally, Spin Master has vigorously pursued other infringers, as well as Emson.  Regardless, pursuing one infringer at a time is not inconsistent with being irreparably harmed.

Next, Emson argues that only the retail price of Spin Master's Zero Gravity cars has dropped, not its wholesale price.  But, the sharp drop in retail price is powerful evidence, on this record, of competition from infringing products.  It also suggests that retailers may abandon Spin Master's products in lieu of lower-priced competing models.

Finally, Emson contends that Spin Master cannot argue that it has been irreparably harmed because it unduly delayed in seeking a preliminary injunction.  But, Spin Master only learned of the Radical Racers in August 2019, and Spin Master's counsel promptly contacted counsel for Emson and thereafter filed suit.  Further, Spin Master learned in October that Emson was selling its toys through the same brick-and-mortar vendors as Spin

Master, and moved that month for this preliminary injunction. There has been no undue delay here.

## IV.   Balance of Hardships

Spin Master has shown that the balance of hardships weighs in favor of granting its motion for a preliminary injunction. The balance of hardships factor "assesses the relative effect of granting or denying an injunction on the parties." Apple, Inc. v. Samsung Elecs. Co., 809 F.3d 633, 645 (Fed. Cir. 2015) (citation omitted).  Factors pertinent to this analysis include, "the parties' size, products, and revenue sources." i4i Ltd. Partnership v. Microsoft Corp., 598 F.3d 831, 862 (Fed. Cir. 2010).  Courts also may consider the centrality of the patented technology to the parties' business.  Id. at 863.  In balancing the hardships, courts may consider the plaintiff's showing of likelihood of success.  Ill. Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 683 (Fed. Cir. 1990).

The balance of hardships tips strongly in favor of Spin Master, for many of the reasons already discussed.  Through its development and marketing of an innovative toy car that climbs walls and races over ceilings, Spin Master has achieved significant market recognition and success.  The exclusivity promised by its patented technology has been threatened by infringers, most recently Emson.  For this holiday season, Emson has gained access to Walmart and Target, which account for 90%

of the Zero Gravity cars sold. Emson was fully aware of the Spin Master Patents before it manufactured its first Radical Racer. Emson chose to enter this lucrative market despite that knowledge and continued to sell the Radical Racers after Spin Master warned it and then sued it.

In arguing that the balance of hardships is in its favor, Emson points to Spin Master's size. But, the companies' relative sizes are not dispositive. Moreover, while emphasizing that sales of Zero Gravity cars comprise only 0.5% of Spin Master's annual revenue, Emson has not provided evidence on what percentage of its revenue is attributable to the Radical Racers. Notably, while Emson argues that it has already invested in advertising the Radical Racers, it has not argued that it has spent any money developing this product. Having long known of the risk of this litigation, Emson must have been prepared for the consequences of it.

## V. Public Interest

"The touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." TEK Global, S.R.L. v. Sealant Systems Int'l, Inc., 920 F.3d 777, 793 (Fed. Cir. 2019) (citation omitted). Here, Spin Master has sought a preliminary injunction to enjoin sales of a likely infringing

toy throughout the holiday season, the time when sales matter the most in the toy industry. There is a strong public interest in promoting inventions through proper protection of patent holder rights. Reducing sales of cheaper, infringing toy automobiles will not harm the public, and Emson does not suggest that it will. The injunction serves the public interest.

## VI.  **Bond**

Finally, Emson requests that Spin Master be required to post a bond sufficient to compensate Emson for losses that may result from this preliminary injunction, should the litigation later resolve in Emson's favor. The posting of a bond is governed by Rule 65(c), Fed. R. Civ. P., which provides that:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c). This Rule "allows a preliminary injunction to become effective only upon the applicant's posting of an amount that the district court determines adequate." Corning Inc. v. PicVue Elecs., Ltd., 365 F.3d 156, 158 (2d Cir. 2004). District courts have "wide discretion" to set the amount of a bond, including to determine that, under the circumstances, no bond is required. Id. (citation omitted). The purpose of a bond is to assure "the enjoined party that it may readily collect damages from the funds posted in the event that it was

wrongfully enjoined . . . without regard to the possible insolvency of the assured," as well as to "provide[] the plaintiff with notice of the maximum extent of its potential liability." Nokia Corp. v. InterDigital, Inc., 645 F.3d 553, 557 (2d Cir. 2011). "Although . . . a wrongfully enjoined party is entitled to a presumption in favor of recovery, that party is not automatically entitled to the damages sought. The presumption applies to 'provable damages.'" Id. at 559.

Emson argues that Spin Master be required to post a bond in the amount of $2.9 million. Estimating that this litigation will not resolve for 13 months and that this preliminary injunction will remain in place for that duration, Emson states that, for this time period, its lost profits on sales would amount to $2.45 million, its warehousing costs for the impounded inventory would be $180,000, and its non-refundable advertising expenses would cost $300,000. Given the strong evidence that Emson has infringed Spin Master's patent, Emson's failure to provide substantial reason to believe that it will succeed at trial, and the unlikelihood of Spin Master's insolvency, a bond in the amount of $1.5 million is sufficient here.

## Conclusion

The plaintiff's October 29 preliminary injunction motion is granted.


Dated:    New York, New York
          December 6, 2019

                        _____
                              DENISE COTE
                     United States District Judge